BLACK, Elwood W., Sr. and Black, Joyce, Appellees,

v.

STEPHENS, Wayne and City of Allentown and Gable, Carson, Appellants.

No. 80–2621.

United States Court of Appeals, Third Circuit.

Argued May 21, 1981.

Decided Sept. 28, 1981.

Rehearing and Rehearing In Banc Denied Nov. 3, 1981.

Richard J. Orloski (argued), Stamberg, Caplan & Calnan, Allentown, Pa., for appellees.

Richard F. Stevens (argued), Butz, Hudders & Tallman, William C. Wickkiser, Kathryn Wohlsen Mayer, Allentown, Pa., for appellants.

Before GIBBONS, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge.

Appellees, Elwood and Joyce Black, filed this section 1983 civil rights action against appellants, Wayne Stephens, Carson Gable, and the City of Allentown, as a result of a confrontation between the Blacks and Detective Stephens on March 21, 1977. The Blacks claimed that Stephens, a plainclothes detective with the Allentown police force, violated their constitutional rights, initially by the use of excessive force in an incident at 10th and Lehigh Streets in Allentown and later by the filing of three unwarranted charges. Gable, then chief of police, and the City of Allentown, were also named as defendants for promulgating a regulation that caused Stephens to file additional charges against Elwood Black in order to delay any disciplinary investigation into the incident. In addition, these defendants were alleged to have adopted a policy that encouraged the use of excessive force by the officers within the department. After an eleven day trial, the jury found all three appellants liable and awarded the Blacks $35,000 in compensatory and punitive damages. Appellants' motions for

judgment n. o. v., or in the alternative a new trial, were denied. On review of the record we hold that there was sufficient evidence to sustain a finding of liability and damages against the defendants. In addition, there were no errors below that require a new trial. We will therefore affirm the judgment of the district court.[1]

## FACTS

The parties hotly contest all but the basic facts. A review of the record, however, reveals the following: On March 21, 1977 at 11:15 p. m. Elwood Black drove his 1976 Cadillac Coupe de Ville to pick up his wife who was finishing work. Upon his arrival he learned that his wife had offered to give Shirley Deily, a co-worker, a ride home. Ms. Deily got in the front passenger seat and Joyce Black got in the rear on the passenger side. They dropped Deily off at 7th and Lehigh Streets and then proceeded west on Lehigh to pick up some sandwiches at a local restaurant.

The Blacks stopped for a red light in the westbound lane of Lehigh at the intersec-

---

1. The United States Supreme Court decided *City of Newport v. Fact Concerts, Inc.,* —— U.S. ——, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) after oral argument had been held in this case. We asked the parties to brief the question of whether *Newport* affects the award of punitive damages against the City of Allentown in this case. Both parties did so.

After reading the briefs, we conclude that *Newport* cannot affect the award of punitive damages against Allentown in this case. Federal Rule of Civil Procedure 51 requires that a party object to jury instructions before the jury retires, "stating distinctly the matter to which he objects and the ground of his objection." Failure to do so constitutes a waiver of any error in the instructions (except plain error, a doctrine which is not at issue here, 101 S.Ct. at 2754.) The argument that Allentown cannot be held liable for punitive damages because it is a municipality was not made before the trial court or before this court prior to oral argument. Thus, Allentown is barred by its "procedural default," *id.,* from asserting that contention now.

In *Newport*, the city first challenged the punitive damages instruction on the ground that a municipality cannot be held liable for punitive damages under 42 U.S.C. § 1983 in its motion for a new trial. The trial court noted that, under Rule 51, the challenge was untimely, but nonetheless reached the legal merits of the argument. The Supreme Court also reached the legal merits, asserting that the trial court had refused to allow Rule 51 to bar the city's contentions. "Although the punitive damages question perhaps could have been avoided simply by a reliance, under Rule 51, upon petitioner's procedural default, the judge concluded that the interests of justice required careful consideration of this 'novel question' of federal law." 101 S.Ct. at 2753–54; footnotes omitted. In sharp distinction to this case, where the issue was neither raised nor briefed in the lower court nor prior to argument in this court, in *Newport* the question of whether a municipality may be held liable for punitive damages "was squarely presented and decided on a complete trial record by the court of first resort, was argued by both sides to the Court of Appeals, and has been fully briefed before this Court." 101 S.Ct. at 2754.

Allentown in its post-argument brief contends that it fulfilled the requirements of Rule 51 when it objected to the punitive damages instruction during the charge conference and again after the instruction had been given. The record does not support Allentown's contention. During the charge conference, Mr. Stevens, counsel for Allentown, stated that "We don't think punitive damages has any part of this case." N.T. 11–72. He elucidated this claim by stating that "I don't believe that punitive damages are proper against the City of Allentown, since they are only secondarily liable, really, and punitive damages is a penalty against the actor, not the person who had an act done for it. The City of Allentown, I don't believe is responsible under the law." N.T. 11–75. The trial court treated this latter statement as an objection to holding the city secondarily liable under a *respondeat superior* theory, and stated that the city, if found liable, would be found directly liable.

After the charge was delivered, Mr. Stevens stated that "I think it is improper under the facts of this case to have charged on punitive damages. I think the Court should have indicated that punitive damages were not proper in this case." N.T. 11–115. The trial court construed Mr. Stevens' statement as a claim that the facts of the case were insufficient to warrant sending the question of punitive damages to the jury, and ruled to the contrary.

At no point did counsel for the city indicate that his objection was based on the legal doctrine that punitive damages may not be awarded under § 1983 against a municipality. "A party may not state one ground when objecting to an instruction and attempt to rely on a different ground for the objection on appeal...." 9 Wright & Miller, Federal Practice and Procedure § 2554 at 647. Thus, *Newport* can have no impact upon the award of punitive damages against the City of Allentown in this case.

tion of 8th Street, and Wayne Stephens, on duty as a plainclothes detective, pulled behind them in an unmarked patrol car. What transpired next is the subject of much dispute.

According to the Blacks, when the traffic light changed Mr. Black and another car proceeded through the intersection at a reasonable rate of speed. After crossing the intersection, detective Stephens suddenly raced up from behind and passed the Blacks' vehicle by crossing the double yellow lines on Lehigh street. Black was startled by Stephens' recklessness and remarked to his wife about the driver.

After passing the Blacks' car, Stephens and the unidentified third car stopped at the intersection of 10th and Lehigh. Black stopped about six feet behind Stephens, in the outside westbound lane. At this point, Stephens jumped out of his car and, without identifying himself, approached the Blacks' car and started screaming that Mr. Black was a "rotten driver." Detective Stephens was wearing slacks, an open collared shirt, and a nylon windbreaker. As Stephens approached, Black put his car in reverse and started to drift backward. After arguing with Stephens for a moment, Black said: "Why am I even bothering. Your car is in the way. It is blocking traffic. Will you move your car so I can move mine and get out of here." (Trial Trans. Vol. 2 at 27.) Black then put his car in drive and attempted to pull around to the left of the approaching detective Stephens. At this point Stephens, pulled out his service revolver and aimed it directly at Black's head, while Mrs. Black, who was still in the right rear seat, was in the precise line of fire. With gun drawn Stephens screamed that Black had driven onto his foot and threatened to shoot if Black did not move the car. Black testified that his car was no where near Stephens' foot, but he backed up and drove around the right of Stephens' vehicle and continued west on Lehigh Street.

Terribly shaken by their encounter with the as yet unidentified gunman, the Blacks drove on toward the sandwich shop at about 40 miles per hour. As they approached 29th and Lehigh, approximately 2.1 miles from 10th and Lehigh, they saw flashing red lights and encountered a police roadblock. They stopped at the roadblock and were arrested for aggravated assault by officer Shoemaker of the Allentown police force.

Detective Stephens' version of the events is, predictably, much different. According to his testimony, Stephens first noticed the Blacks' vehicle as he pulled behind their car at the intersection of 8th and Lehigh. When the light changed, the Blacks' car, originally in the outside westbound lane of Lehigh, started to swerve into the inside lane. As Stephens began to pass in the outside or passing lane, the Blacks' vehicle swerved back into the left lane and forced Stephens' over both yellow lines, into the eastbound traffic. Stephens stopped for a red light at 10th and Lehigh and the Blacks' car screeched to a stop a few inches behind him. Stephens, worried that the driver might be intoxicated or that something was amiss, got out of his car and walked toward the Blacks' vehicle, which was now drifting backward slowly. Stephens inquired if there was anything wrong and Black screamed that Stephens was a "rotten driver." At this point the Blacks' car lurched directly at him and the left front tire rolled onto detective Stephens' foot. He screamed in vain for Black to get off his foot. Finally, because of the excruciating pain, Stephens drew his revolver and ordered Black to remove his car. Black then backed up and swung to the right through the intersection.

A high speed chase ensued, with Stephens testifying that he traveled at 75 to 80 miles per hour to stay in visual contact with the Blacks' car. Stephens radioed for help and officer Shoemaker set up a road block at 29th and Lehigh Streets. When Stephens arrived at the roadblock, Shoemaker was escorting Elwood Black into a squad car.

The parties have a general understanding as to what happened next. Elwood and Joyce Black were transported by officer Shoemaker to the Allentown Police station. During this trip, Black was very upset and

promised to "get his [Stephens'] ass." Black was also concerned about a handgun, registered legally in his name, that was in the glove compartment of his car. Officer Shoemaker radioed the units to search the car for the gun, as well as some medicine Black needed for his asthma.

At about 1:00 a. m. Wayne Stephens filed a criminal complaint for aggravated assault against Black. While filling out the complaint, Stephens testified that Black was still extremely upset and had promised to complain to Chief Gable and the Mayor of Allentown. In addition, at the police station, Stephens testified that Black said he needed his handgun because "the world is full of nuts like [Stephens], and that if he had his gun, he'd shoot [Stephens]." Black was arraigned by Magistrate Stahl and released on his own recognizance at approximately 1:40 a. m.

Elwood Black returned to the police station on March 23, 1977 to register a complaint about Wayne Stephens and the events leading to his arrest on the evening of March 21. He spoke with Chief of Police Carson Gable, but was informed that no investigation of Stephens' conduct would commence until the charge against Black was resolved. Chief Gable cited a police regulation, contained in the official police manual that states: "Please Note: Where a complaint alleging misconduct on the part of an officer arises from an incident where the officer made an arrest, disciplinary hearings (against the officer) will not take place until the arrest charges are finally adjudicated." (Allentown Police Department Blue Book at 15a.) (Trial Trans. Exhibit Q) At trial, Chief Gable testified that he handled personally all complaints by private citizens against police officers. In addition, Gable testified that he drafted the regulation and that it was part of every police officer's "Blue Book" or the department's internal operating procedures.

Stephens claims that in the morning following the arrests, he consulted the Lehigh County Assistant District Attorney, Lynn Cole, in accordance with established policy relating to night arrests. Stephens claims Cole recommended that three additional charges be filed against Black. This testimony is, however, unsubstantiated; Cole took a new position in Florida prior to the trial and was not called as a witness. Further, there were no additional charges filed until approximately a week later.

On March 23 or 24, Chief Gable met with detective Stephens and informed him of Elwood Black's complaint about his use of excessive force during the March 21, 1977 incident. Thereafter, on March 29, 1977, Stephens filed three additional charges against Black based on the March 21 incident: recklessly endangering another person, carrying a concealed deadly weapon, and terroristic threats.[2] (Trial Trans. Vol. 4 at 47) The charges of carrying a concealed weapon and terroristic threats were subsequently dropped and Black was found not guilty on the recklessly endangering charge. Black was later found guilty of simple assault, but on appeal this conviction was vacated and remanded for new trial. The record is silent as to the present status of this case. (Trial Trans. Vol. 11 at 20, 49–50)

The Blacks commenced this civil rights action against appellants pursuant to 42

---

2. *Commonwealth v. Black*, Criminal Docket # 1–4–265. 18 Pa.Cons.Stat. §§ 2705, 2706, & 6106 (Purdon 1973). These statutes provide:

*Recklessly Endangering Another Person:*
A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury.
18 Pa.Cons.Stat. § 2705 (Purdon 1973).
*Terroristic Threats*
A person is guilty of a misdemeanor of the first degree if he threatens to commit any crime of violence with intent to terrorize an-

other or to cause evacuation of a building, place of assembly, or facility of public transportation, or otherwise to cause serious public inconvenience, or in reckless disregard of the risk of causing such terror or inconvenience.
18 Pa.Cons.Stat. § 2706 (Purdon 1973).
*Firearms not to be carried without a license*
(a) Offense defined.—No person shall carry a firearm in any vehicle or concealed on or about his person, except in his place of abode or fixed place of business, without a license therefor as provided in this subchapter.
18 Pa.Cons.Stat. § 6106 (Purdon 1973).

U.S.C. § 1983 (1976) on May 7, 1977 in the United States District Court for the Eastern District of Pennsylvania.[3] At trial, special interrogatories were submitted to the jury and all appellants were found liable. In particular the jury found:

Q: 6. Do you find that Defendant Wayne Stephens used excessive force against Plaintiff Joyce Black at 10th and Lehigh Streets on March 21, 1977?

A: Yes.

Q: 7. Do you find that Defendant Wayne Stephens used excessive force against Plaintiff Elwood Black at 10th and Lehigh Streets on March 21, 1977?

A: Yes.

Q: 14. Do you find that Defendant Carson Gable promulgated and implemented an administrative regulation which proximately caused Defendant Wayne Stephens to arrest and file unwarranted charges against Plaintiff Elwood Black?

A: Yes.

Q: 15. Do you find that Defendant City of Allentown promulgated and implemented an administrative regulation which proximately caused Defendant Wayne Stephens to arrest and file unwarranted charges against Plaintiff Elwood Black?

A: Yes.

Q: 16. Do you find that Defendant Carson Gable had a policy of encouraging members of the Allentown Police Department to engage in the use of excessive force in the performance of their duties as police officers?

A: Yes.

Q: 17. Do you find that Defendant Carson Gable's policy of encouraging members of the Allentown Police Department to engage in the use of excessive force in the performance of their duties as police officers proximately caused Defendant Wayne Stephens to use excessive force against Plaintiff Joyce Black or Plaintiff Elwood Black at 10th and Lehigh Streets on March 21, 1977?

A: Yes.

(Joint Appendix at 10–12.)[4] The jury then awarded $500 in compensatory damages against Wayne Stephens, $3,000 in compensatory and $1,500 in punitive damages against Carson Gable, and $20,000 in compensatory and $10,000 in punitive damages against the City of Allentown.

Each appellant submitted a motion for judgment n. o. v. and each motion was denied. In addition, the appellants submitted motions for a new trial on four grounds: one, that the jury's verdict was against the weight of the evidence; two, that the awards of damages were arbitrary and excessive; three, that several items of crucial evidence were improperly excluded; and four, that the trial court erred in its instructions to the jury. After a review of the record we hold that there is enough evidence to support the jury's verdict against each appellant. Further, appellants' motions for a new trial are also without merit. We will, however, examine each of appellants' claims.

## DISCUSSION

■ In examining the trial court's denial of appellants' motions for judgment n. o. v., we are required to "review the record in this case in the light most favorable to the non-moving party, . . . and to affirm the judgment of the district court denying the motions unless the record is 'critically deficient of that minimum quantum of evidence from which the jury might reasonably afford relief.'" *Dawson v. Chrysler Motor Corp.*, 630 F.2d 950 (3d Cir. 1980), *cert.*

3. The text of section 1983 states:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (1976).

4. Other than appellants' general directed verdict motion, counsel had no objection to either the substance or the wording of the jury interrogatories. (Trial Trans. Vol. 8 at 3)

*denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981), *quoting Denneny v. Siegel,* 407 F.2d 433, 439 (3d Cir. 1969). *See Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1273 (3d Cir. 1979); *Rich v. U. S. Lines,* 596 F.2d 541, 544 (3d Cir. 1979). Our examination of the record reveals enough evidence from which a jury could rationally find appellants liable under section 1983.

■ Initially, appellant Wayne Stephens contends that the evidence was insufficient to prove that he was acting under color of state law during the March 21 incident or that he deprived the Blacks of any constitutional rights during their confrontation. Stephens himself testified that during the evening of March 21, 1977, he was on duty as a member of the Allentown Police force, dressed in a police academy windbreaker and that he investigated the Blacks' vehicle because he thought the driver was either intoxicated or in need of help. (Trial Trans. Vol. 3 at 141, 153; Vol. 4 at 58) As such, Stephens was acting under color of state law for purposes of section 1983. *Screws v. United States,* 325 U.S. 91, 107–108, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495 (1944). *Gillard v. Schmidt,* 579 F.2d 825, 829 (3d Cir. 1978).

■ Stephens also argues that the jury could not have found that he violated any constitutional right of the Blacks. We disagree. A law enforcement officer's infliction of personal injury on a person by the application of undue force may deprive the victim of a fourteenth amendment "liberty" without due process of law. *Shillingford v. Holmes,* 634 F.2d 263, 265 (5th Cir. 1981). As this court stated in *Rhodes v. Robinson,* 612 F.2d 766, 772 (3d Cir. 1979), "The protection of fundamental liberties by the due process clause and the eighth amendment extends to protection from an official's abu-sive exercise of his powers to inflict grossly undue harm." Not all common law torts committed by police officers, however, rise to the level of a constitutional harm actionable under section 1983. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 409, 91 S.Ct. 1999, 2011, 29 L.Ed.2d 619 (1971) (Harlan, J. concurring). *Howell v. Cataldi,* 464 F.2d 272, 274–75 (3d Cir. 1972). The test under the due process clause is whether the police officer's conduct "shocks the conscience." *Rhodes,* 612 F.2d at 772, *quoting Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952).

■ There is more than enough evidence from which the jury could find that Stephens' actions deprived the Blacks of their constitutional rights. While there was conflicting testimony at trial, Elwood Black testified that his car was never on detective Stephens' foot and that he did not provoke Stephens to draw his gun.[5] (Trial Trans. Vol. 2, at 159) In addition, an expert witness testified that the Blacks' car weighed 5,160 pounds and that 1,340 pounds of pressure would be exerted by the left front tire that was allegedly on Stephens' foot. (Trial Trans. Vol. 2 at 103–04) Yet Dr. George Moerkirk, the physician who examined detective Stephens immediately after the incident, testified that there were no contusions, lacerations or visible signs of any injury to Stephens' toe. (Trial Trans. Vol. 2 at 110–11) The X-rays for fractures and dislocations were also negative. (Trial Trans. Vol. 2 at 111) While there are certainly conflicting versions of the incident at 8th and Lehigh, viewing the evidence in the light most favorable to the non-moving party, we cannot hold that the jury's finding of liability was irrational. *Cf. Collins v. Signetics Corp.,* 605 F.2d 110, 115 (3d Cir. 1979)

5. In addition, Stephens' version of the "high speed chase" from 10th and Lehigh to 29th Street was contradicted by both the testimony of Officer Shoemaker and appellee Elwood Black. Officer Shoemaker testified that Black's car was travelling at 40 miles per hour when he first saw it approaching the roadblock at 29th and Lehigh Streets. (Trial Trans. Vol. 7 at 71) This estimated speed parallels Elwood Black's testimony and would explain how, within the time it took Black to travel 2.1 miles, Officer Shoemaker had time to receive Stephens' radio transmission, drive to 29th and Lehigh, set up a roadblock, and still wait 30 seconds before he saw the headlights of Black's vehicle approximately three-quarters of a mile away. (Trial Trans. Vol. 7 at 69–71)

(appellate court has no authority to substitute its judgment for that of the jury). For an unidentified officer to brandish his revolver eighteen inches from Elwood Black's head with Mrs. Black in the precise line of fire and then threaten to shoot, is conduct that shocks the conscience. *Rhodes*, 612 F.2d at 772.

Appellant Carson Gable, Chief of Police in Allentown, was held liable for damages under two theories. First, the jury found that Chief Gable promulgated and implemented a police regulation that caused detective Stephens to file three unwarranted charges against the Blacks. Second, the jury found that Chief Gable had a policy of encouraging members of the Allentown police department to use excessive force in the performance of their duties and that this policy was the proximate cause of Stephens' use of excessive force against the Blacks. Appellant Gable claims that there is no evidence in the record to support such a verdict. We disagree.

■ To hold a police chief liable under section 1983 for the unconstitutional actions of one of his officers, a plaintiff is required to establish a causal connection between the police chief's actions and the officer's unconstitutional activity. *Commonwealth of Pennsylvania v. Porter*, 659 F.2d 306 at 321 (3d Cir. 1981) (en banc). The court in *Porter* recognized that "*Rizzo v. Goode* [423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)] requires that we focus on the degree to which [the police chief] participated in a pattern of violation by virtue of knowledge, acquiescence, support and encouragement." *Porter*, at 321. As Judge Garth emphasized in *Lewis v. Hyland*, 554 F.2d 93, 98 (3d Cir.), *cert. denied*, 434 U.S. 931, 98 S.Ct. 419, 54 L.Ed.2d 291 (1977), the "mere invocation of

the 'pattern' or 'plan' [will] not suffice without this causal link." *Id. citing Rizzo v. Goode*, 423 U.S. 362, 375–77, 96 S.Ct. 598, 606–07, 46 L.Ed.2d 561 (1975). *Cf. Maclin v. Paulson*, 627 F.2d 83, 86 (7th Cir. 1980) (mere acquiescence by police chief when he is on notice of constitutional violations is sufficient to trigger liability under section 1983).

■ The jury returned findings of two such causal connections in this case. First, in response to interrogatory number 14 they found that Chief Gable's regulation, delaying any disciplinary investigation of an officer's conduct until the underlying arrest was resolved, proximately caused detective Stephens to file unwarranted charges against Elwood Black. Second, in response to interrogatory number 17, the jury found that Chief Gable had a policy of encouraging the use of excessive force and that this policy proximately caused detective Stephens to use such force against the Blacks during the March 21, 1977 incident.[6] We have examined the record and hold that it supports these findings.

■ Initially, there is sufficient evidence to establish that Gable promulgated the regulation and had authority to do so. Carson Gable testified that while he was Chief of Police he was the "disciplinary agent" for the police department; internal discipline was under his control. (Trial Trans. Vol. 4 at 119) As part of this responsibility, Chief Gable wrote and implemented the disciplinary regulation at issue: "Please Note: Where a complaint alleging misconduct on the part of an officer arises from an incident where the officer makes an arrest, disciplinary hearings (against the

**6.** Special Interrogatories 14 and 17 state:
Q. Interrogatory No. 14, Do you find that defendant Carson Gable promulgated and implemented an administrative regulation which proximately caused defendant Wayne Stephens to arrest and file unwarranted charges against Elwood Black?
A. Yes.
Q. Interrogatory 17 reads, Do you find defendant Carson Gable's policy of encouraging

members of the Allentown Police Department to engage in the use of excessive force in the performance of their duties as police officers proximately caused defendant Wayne Stephens to use excessive force against plaintiff Joyce Black or plaintiff Elwood Black at 10th and Lehigh Streets on March 21, 1977?
A. Yes.

officer) will not take place until after the arrest charges are finally adjudicated." (Allentown Police Department Blue Book at 15a) (Exhibit Q) This regulation was contained in the "Blue Book" which Stephens testified was a printed copy of the department's rules and regulations, "sort of like our laws that we have to live up to."[7] (Trial Trans. Vol. 4 at 44)

■ The causal nexus between this regulation and Stephens' filing of unwarranted charges is supported by the timing of charges filed against Elwood Black. It is agreed by all parties that Mr. Black was charged solely with aggravated battery on March 21, 1977. On March 23, Mr. Black met with Chief Gable, and complained bitterly about detective Stephens' conduct. Gable then testified that "a day or two after" his meeting with Black he spoke with Stephens to inform him of Black's complaints and get his version of the incident. (Trial Trans. Vol. 4 at 155) Approximately five days after this meeting, on March 29, 1977, Stephens filed three other charges against Elwood Black. Although detective Stephens testified that he filed these additional charges before he met with Chief Gable, (Trial Trans. Vol. 2 at 47) in light of Chief Gable's testimony that he met with Stephens on the 23d or 24th, and that the actual date of the additional charges was March 29, it was reasonable for the jury to infer that Stephens filed the three additional charges in an effort to delay any disciplinary hearing on the incident.[8] This evidence supports the jury's finding of the encouragement and support required to

hold Chief Gable liable under section 1983. *Porter,* at 321–322.

■ Turning to the jury's finding of a connection between Gable's policy of promoting the use of excessive force and Stephens' conduct on the evening of March 21, while the evidence is not overwhelming, it is still sufficient to sustain the jury's finding. This court's task is not to review the record *de novo,* but rather to uphold the jury's verdict if the record contains that minimum quantum of evidence from which the jury could have rationally reached a verdict. *Dawson,* 630 F.2d at 959. Our examination of the record reveals such evidence. Chief Gable's policy concerning the use of excessive force ensured that a citizen's complaint about excessive force never went into a police officer's permanent personnel file. (Trial Trans. Vol. 4 at 132–33) Indeed, such a complaint could only get into an officer's record if the officer put it there himself. Although Chief Gable stated that he was in exclusive control of police discipline, he testified that he never initiated a disciplinary action against an officer based solely on his evaluation of the officer's use of force. (Trial Trans. Vol. 4 at 146) In addition, while Gable testified that an officer's use of force had no influence whatsoever on his chances for promotion, (Trial Trans. Vol. 4 at 145), he added that Officer Stephens probably would not have been promoted to detective if he had been the type of officer who backed down when force was involved. *Id.* at 146. Finally, Chief Gable stated that any officer "worth his salt" would use force every week of his career because very few arrests are made

---

**7.** Although Stephens testified that he was never aware of this regulation, Chief Gable stated that each officer was issued this Blue Book and that it contained a specific code of discipline and penalties. (Trial Trans. Vol. 4 at 122) Taking this testimony in the light most favorable to appellees it was reasonable for the jury to find that Stephens had knowledge of his department's rules and regulations.

**8.** Occasionally during the trial, counsel for appellants argued that the filing of additional charges against Elwood Black would not have delayed a disciplinary hearing about the March 21, 1977 incident. (*See, e. g.,* Trial Trans. Vol.

2, at 177–181). Appellants contend that additional charges are adjudicated at the same time as the initial aggravated battery charge so filing additional charges would not delay the disciplinary hearing. We note that this argument was never presented to the jury. But also, we reject the reasoning underlying this claim, as did the district court. The filing of additional charges would certainly postpone an adjudication of the initial charge because further fact finding and preparation would be required. Hence the addition of these extra charges would necessarily delay any internal disciplinary hearings.

without it.[9] (Vol. 4 at 135, 137) This testimony, when viewed in the light most favorable to the Blacks, supports the jury's responses to the interrogatories that establish the nexus between Gable's policy of promoting force and Stephens' use of excessive force in the incident with the Blacks.

The City of Allentown also appeals the trial court's denial of its motion for judgment n. o. v. The City argues that *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 693, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978), prevents a municipality from being held liable for the actions of its agents under a theory of *respondeat superior*. While we agree with this position, Allentown was not found liable under such a theory. Rather, the city was held liable because of a governmental policy that proximately caused detective Stephens to file unwarranted charges against Elwood Black.

In *Monell*, the court held that municipalities may be sued directly under section 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, ordinance, regulation or decision. *Id.* at 690–91, 98 S.Ct. at 2035–36; *Landrigan v. City of Warwick*, 628 F.2d 736, 746 (1st Cir. 1980). The Court went on to emphasize, however, that a city's liability can be triggered by persons other than the municipality's official lawmakers: "[I]t is when execution of a government's policy or custom, *whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy*, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 435 U.S. at 694, 98 S.Ct. at 2037. (emphasis supplied)

In this case Chief Gable "may fairly be said to represent official policy" for the city of Allentown. *Id.* He wrote and implemented an official police regulation concerning disciplinary hearings which the jury found proximately caused Stephens to file unwarranted charges against Elwood Black. Chief Gable is the final authority in charge of the police force in Allentown. He is a member of the Mayor's cabinet, proposes and manages the budget and establishes policies and procedures for the entire police department. (Trial Trans. Vol. 4 at 118–19). Acting in this capacity, Chief Gable's promulgation of the regulation was an official act of policy which the jury found proximately caused Stephens to file unwarranted charges. *Cf. Schneider v. City of Atlanta*, 628 F.2d 915, 920 (5th Cir. 1980) (Prison director can engage the city's liability if he is the final authority or ultimate repository of city power). *Landrigan*, 628 F.2d at 747 n.8 (municipality is absolved from liability under section 1983 because of plaintiff's failure to allege an official whose actions might be considered those of the town.) This is a sufficient basis for the municipality's liability under *Monell* and section 1983.

Finally, appellants presented the district court with several motions for new trial. All of these motions were denied, and

---

**9.** In addition, the record reveals two other incidents where citizens complained about detective Stephens. One incident involved the beating and wounding of Duane Roach. According to the evidence at trial, Duane Roach was riding a 250cc dirt bike up and down the steps of a local public school in the spring of 1976 when Officer Stephens happened by on horseback. After chasing Roach around several playing fields, Stephens cornered the youth in a corral. When Roach tried to escape Stephens "threw a good left and floored him." Duane Roach and his brother then complained to the desk sergeant about Stephens' violence and Gable testified he was aware of the incident. Indeed, Stephens' police report in which he claimed to throwing a "good left" and "flooring" Duane Roach was submitted to Gable and admitted into evidence (Trial Trans. Vol. 4 at 151, Exhibit E).

A second incident involving Barbara Titlow, occurred on July 10, 1976, and again caused private citizens to complain to city officials about Stephens. In this incident, Stephens confronted several horseback riders who had left a bridle path in order to avoid an obstruction. Stephens, wearing shorts and a T-shirt, failed to identify himself as a police officer, and began "screaming" and "yelling" at the riders to keep their horses off the grass. (Trial Trans. Vol. 2 at 130–45). Although Titlow attempted to register her complaint to Chief Gable, she was unable to meet with him. Instead, she conveyed her complaint to the Mayor, the City Solicitor, and Chief Gable's secretary.

an appellate court should not grant a new trial unless refusal to take such action is inconsistent with substantial justice.[10] *Fortunato v. Ford Motor Company*, 464 F.2d 962, 967 (2d Cir. 1972). We will affirm the district court's denial of these motions.[11]

■ Appellants first claim that a new trial must be awarded because the award of damages against all three appellants was arbitrary and excessive. The appellants were assessed a total of $35,000 in compensatory and punitive damages. We must affirm the jury's damage award unless it is "so grossly excessive as to shock the judicial conscience." *Murray v. Fairbanks Morse*, 610 F.2d 149, 152–53 (3d Cir. 1979); *Edynak v. Atlantic Shipping Inc. Cie. Chambon*, 562 F.2d 215, 225–26 (3d Cir. 1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978). This case does not reveal an abuse of discretion. The trial judge instructed the jury carefully on the issue of damages, (Trial Trans. Vol. 11 at 99–111) and specifically emphasized that each defendant can be found liable for only those damages it caused. (*Id.* at 109) In addition, the court emphasized that punitive damages could be awarded only if the jury found that a particular defendant acted with reckless disregard or indifference to the right of the injured person. These instructions were not erroneous. *Cochetti v. Desmond*, 572 F.2d 102, 105–06 (3d Cir. 1978).

■ The appellants also assert that there was an improper foundation for the award of attorney's fees. This argument is without merit. The hourly rate, total bill, and services rendered by all attorneys were presented to the jury. (Trial Trans. Vol. 11 at 19–20) The jury's fee award was reasonable.

■ Appellants' next contention is that the trial court erred in the exclusion and admission of certain evidence. Specifically, appellants claim that the admission of evidence as to Stephens' prior use of force and the court's refusal to admit evidence of Stephens' prior recommendations was substantial error. We disagree. Stephens' prior confrontations with private citizens were not admitted to show his character or that he acted in conformity therewith, but rather to show appellant Gable's knowledge of these acts. (Trial Trans. Vol. 7 at 1–4) As to the evidence of Stephens' prior recommendations for good conduct, the court held that this was material so long as it was coupled with a showing that Chief Gable had knowledge of these "good arrests." (Trial Trans. Vol. 7 at 3) In addition, any error about Stephens' propensity to use excessive force prior to March 21, 1977 was rendered harmless by the jury's response to special interrogatory Number 9. The trial court asked: "Do you find that defendant Wayne Stephens, prior to March 21, 1977, had a propensity to use excessive force in the performance of his duties as a police officer?" The jury responded "No." Consequently, any error on the admission of Stephens' propensity for excesses prior to March 21, 1977 was ultimately harmless. *Leizerowski v. Eastern Freightways, Inc.*, 514 F.2d 487, 492 (3d Cir. 1975); *James v. Continental Ins. Co.*, 424 F.2d 1064 (3d Cir. 1970).

10. Rule 61 of the Federal Rules of Civil Procedure states:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

11. Appellants present a motion for new trial on the ground that the jury's verdict is unsupported by the manifest weight of the evidence. Such a motion is ordinarily a matter for the discretion of the trial court. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980). The lower court's decision will be reviewed solely for an abuse of discretion. *Thomas v. E. J. Korvette, Inc.*, 476 F.2d 471, 474–75 (3d Cir. 1975). 6A Moore's Fed.Prac., 59.05[5] (2d ed. 1979). In light of our discussion on the evidence with respect to appellants' motions for judgment n. o. v., we hold that the trial court did not abuse its discretion in this case.

Appellants challenge the trial court's jury instructions in four respects: first, the court erred in submitting the issue of probable cause for the arrest at 29th and Lehigh to the jury; second, the court erred in charging the jury on the promulgation of the administrative regulation; third, the court erred in charging the jury on the issue of effective assistance of counsel and fourth, the court's reply to the jury's note requesting the legal definition of excessive force was overbroad and not responsive.

■ Appellants' first and third grounds for error—submitting the issue of probable cause for the arrest at 29th and Lehigh and whether the Blacks were denied effective assistance of counsel—cannot be grounds for a new trial. Even assuming, *arguendo*, some error in the instructions existed, it was rendered harmless by the jury's ultimate finding. In response to interrogatories 4 and 5, the jury found that while the arrest at 29th Street was not based on probable cause, it was undertaken by detective Stephens in good faith and with a reasonable belief in the existence of probable cause. As such, the appellants were not prejudiced by the actual incident at 29th and Lehigh.[12] *Leizerowski*, 514 F.2d at 492. In addition, the jury also found that detective Stephens did not deny Elwood Black the effective assistance of counsel. *See* Special Interrogatory Number 8, Joint Appendix at 10. Therefore neither of these alleged errors can serve as a basis for new trial. *Id.*

■ Appellants also object to the court's instruction on the promulgation of exhibit Q, the Allentown Police Blue Book Regulation. The validity of this instruction must be viewed in conjunction with the court's entire charge in order to determine if a new trial is warranted. *United States v. Palm-*

*eri*, 630 F.2d 192, 201 (3d Cir. 1980), *cert. denied*, 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981). Appellants' major complaint centers on the court's failure to define "unwarranted charges" for the jury. The trial court's instructions, while not explaining the meaning of "unwarranted" are quite specific as to the requirement that Stephens' subsequent criminal charges against Elwood Black had to have been proximately caused by the police regulation at issue. (Trial Trans. Vol. 8 at 59–60). This charge stresses the crucial finding for the jury. While further explanation of "unwarranted" might have clarified any questions, the instructions, when viewed on the whole, were not reversible error.

■ Appellants' final argument is that the trial court erred in replying to the jury's note requesting a definition of excessive force. The trial court's response simply recited the original charge on this issue. There was no objection from either counsel when the instruction was read originally or in response to the jury's questions. *See Juneau Square Corp. v. First Wisconsin Nat. Bk. of Milwaukee*, 624 F.2d 798, 810 (7th Cir. 1980), *cert. denied*, 449 U.S. 1013, 101 S.Ct. 571, 66 L.Ed.2d 472 (1981) (where a party does not object to a jury charge it is not subject to review). Nevertheless, we have examined the instruction and hold that it focused on the correct definition of excessive force.

Therefore, for the reasons expressed above, the trial court's denial of appellants' motions for judgment n.o.v. and new trial will be affirmed.

GARTH, Circuit Judge, concurring in part and dissenting in part.

My disagreement with the majority opinion may be simply stated: There is just no evidence in this record which can support

12. The court was quite specific in its instructions on detective Stephens' liability for the arrest at 29th and Lehigh:

May I add, Members of the Jury, that even though you find an arrest without probable cause at 10th and Lehigh Streets or even though you find no probable cause for the 29th and Lehigh Streets arrest, you must, however, make another determination before you can hold Wayne Stephens liable for ei-

ther or both of those events. This is so because Wayne Stephens is not liable for either of those arrests if two conditions are met: One, the officer must believe in good faith that the arrest was valid, that is that there was probable cause; two, that belief must have been a reasonable one.

(Trial Trans. Vol. 8 at 50). This instruction was not erroneous.

any finding of liability in any amount against Police Chief Carson Gable or the City of Allentown. Additionally, the majority opinion has virtually ignored the various damages issues raised by Gable and the City—issues that present substantial questions of law and which, in my opinion, infect the entire damage judgment against these two defendants. It is for these reasons that I dissent.[1]

The complaint of plaintiffs Joyce and Elwood Black against Detective Wayne Stephens is not complicated. They complain that Stephens pointed a gun at them and then filed unwarranted charges against Mr. Black. As a result of the criminal proceedings allegedly wrongfully initiated by Stephens, Mr. Black incurred attorneys' fees and court costs and lost approximately $250 in sales commissions during the period he had to be present in court. The other damages claimed by Mr. and Mrs. Black were almost totally subjective, consisting primarily of embarrassment, humiliation, mental anxiety, and discomfort at having to explain the criminal proceedings to family, friends, and customers. At trial, only the plaintiffs testified as to these damages. No psychiatrists, other doctors, or other experts testified with respect to damages. No lawyer testified as to the reasonableness or necessity of the attorneys' bills that Mr. Black testified he had incurred. The jury found Stephens liable for $500. On this record, I cannot say that this verdict was unfounded. *See* note 1 *supra.*

What is impossible to understand from this record, however, is the jury's findings of liability on the part of Gable and the City, and the jury's assessment of damages against these two defendants. I can find no support in the record for the jury's conclusions that defendants Gable and the City promulgated and implemented an administrative regulation which proximately caused Stephens to arrest and file unwarranted charges against Mr. Black; that Gable had a policy of encouraging members of the Allentown Police Department to engage

in the use of excessive force in the performance of their duties as police officers; or that this policy proximately caused Stephens to use excessive force against the plaintiffs.

In addition, quite apart from the underlying issue of liability, the record discloses no evidentiary foundation that would permit the jury to consider evidence of the attorneys' fees that apparently constituted a major portion of the damage award assessed against the City. Moreover, the jury improperly apportioned the damages among the defendants, assessing *for the same injuries* damages which were nine times as high against Gable and sixty times as high against the City as were assessed against Stephens himself. The record is totally naked of any evidence that could support any award of punitive damages against either Gable or the City. The $10,000 punitive damage award against the City is also contrary to the Supreme Court's recent holding in *City of Newport v. Fact Concerts, Inc.,* —— U.S. ——, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), that punitive damages are not available against a municipality in an action under 42 U.S.C. § 1983. Compounding the errors respecting damages is the fact that the City was assessed $30,000 in damages in favor of both Mr. and Mrs. Black. Yet, the record is crystal clear that Stephens had never filed any criminal charges against Mrs. Black and it was only the criminal charges which gave rise to that award.

Because I believe the result in this case is seriously flawed as it pertains to the liability of Gable and the City, and because the majority opinion fails to give effect to established principles of damages, I am obliged to dissent. In so doing, it becomes necessary to examine the record in depth.

## I. POLICE CHIEF GABLE

### A.

As the majority acknowledges, the case law is clear that to obtain relief against

---

1. With respect to Detective Wayne Stephens I agree that his liability and the damages assessed against him were jury questions. The jury having found him liable and having deter- mined that Stephens, as the primary actor, injured the plaintiffs to the extent of $500, I cannot disagree with the majority in affirming the judgment as to him.

Gable, Allentown's Chief of Police, the plaintiffs must demonstrate that he played an affirmative role in the deprivation of their rights. Specifically, there must be a causal link between Gable's actions and Stephens' challenged misconduct.

In *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Supreme Court articulated the standard governing liability of municipal officials for police misconduct. As this court observed in *Lewis v. Hyland*, 554 F.2d 93, 98 (3d Cir.), *cert. denied*, 434 U.S. 931, 98 S.Ct. 419, 54 L.Ed.2d 291 (1977), *Rizzo* "was aimed at the failure of plaintiffs to prove the existence of an unconstitutional policy or plan adopted and enforced by the official defendants. Throughout, the Court emphasized the complete absence of any causal link between the individual police officers' conduct and the responsible authorities. Mere invocation of the words 'pattern' or 'plan' did not suffice without this causal link." *Accord, Commonwealth of Pa. v. Porter*, 659 F.2d 306, 336 (3d Cir. 1981) (en banc) (opinion of Garth, J.).

In *Lewis*, the plaintiffs sought injunctive relief against the New Jersey State Police for an alleged pattern and practice of unconstitutional searches of vehicles and travelers by various State Troopers. In affirming the denial of injunctive relief, this court concluded:

> Plaintiffs' evidence here demonstrated at most an unfortunate insensitivity on the part of responsible officials toward reports of abuses by individual Troopers. The department's apparent obliviousness to citizens' complaints reinforces an impression of official indifference. Beyond these factors, however, and aside from the statistical number of incidents proved, there is no evidence of a causal link between, on the one hand, either the State Police hierarchy or any department-wide directive, and, on the other, the constitutional violations.

554 F.2d at 101 (footnotes omitted).

Thus, if Police Chief Gable and the City of Allentown are to be held liable, the record evidence must disclose that Detective Stephens' actions toward Mr. and Mrs. Black on the evening in question were affirmatively linked to some action taken by Police Chief Gable. As the following discussion of the record reveals, the evidence adduced at trial cannot support such a conclusion.

### B.

The record shows that Chief Gable wrote and distributed to each Allentown police officer a manual containing, within the section headed, "Citizen Complaints Against Police Officers," the following provision: "Please note: Where a complaint alleging misconduct on the part of an officer arises from an incident where the officer made an arrest, *disciplinary hearings will not take place until after the arrest charges are finally adjudicated.*" App. at 43–44 (Exh. Q); Trial Tr. Vol. 4 at 121–22 (emphasis added). The majority's position is that the mere *existence* of this regulation, coupled with the finding that Stephens filed additional charges against Black after learning of Black's complaint against him, is sufficient basis for the jury's finding that the regulation "proximately caused" Stephens to arrest and file the additional charges. The majority reaches this conclusion despite the absence of any evidence in the record that Stephens ever knew of the regulation, that he was motivated by it to file the additional charges, or that the regulation would in fact have been of any benefit to him in avoiding the consequences of any misconduct on his part.

Contrary to the suggestions of the majority, there is nothing sinister about the police department regulation in question. As the evidence discloses, the regulation is designed to provide for an orderly disposition of both the criminal charges against the complainant and the complainant's charges against the police officer, and to prevent each inquiry from interfering with the other. As Gable testified at the trial:

> In my opinion, first things come first. The arrest was first. . . . Now, there is a pending criminal case. If I would get into an employer-employee relationship for internal discipline prior to that case

being heard, it would be almost impossible to separate the two. In other words, our internal case would be intertwined in a criminal case and I would have no control over the testimony.

When you get a chance to see this complaint form, I think you will note that lawyers would be present for each side. They could cross-examine each other and it would so entwine a criminal and an employee personnel case that it couldn't be severed and could actually harm a criminal case.

*Trial Tr. Vol. 7 at 131–32.* Although one consequence of disposing of the criminal charges before addressing the allegations of police misconduct is that disciplinary proceedings may be delayed, the explicit terms of the regulation preclude any interpretation that the regulation was designed to provide a means by which an officer could shield his conduct from departmental scrutiny. The regulation merely delays disciplinary hearings; it does not dispense with them or allow the police officer ultimately to avoid them. As Gable explained at trial:

I considered that any delay could certainly not have high priority. Our employees are constant; we don't lay them off every week or two or every year. In fact we don't lay them off, so that discipline could eventually occur but the discipline in most cases would range from a reprimand to a day or two without pay up to ten days. If I felt that it warranted more than that, I had the privilege of going to City Council and attempting to get a higher penalty or dismissal.

*Id.* at 132. When asked at trial whether it had ever come to his attention that any officers on the Allentown police force were filing false charges because of the regulation, Gable replied, "No, it didn't. I don't see what could be gained . . . ." *Id.*

The majority's conclusion that the record evidence supports a causal link between the regulation and Stephens' filing of additional charges against Black depends on a string of tenuous inferences that do not constitute

" 'that minimum quantum of evidence from which a jury might reasonably afford relief.' " *Dawson v. Chrysler Corp.,* 630 F.2d 950, 959 (3d Cir. 1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981) (quoting *Denneny v. Siegel,* 407 F.2d 433, 439 (3d Cir. 1969)). There is no direct evidence that Stephens was ever aware of the regulation's existence; at trial, he testified that he had never read the regulation before. *Trial Tr. Vol. 4 at 45.* The jury would have had to infer that Stephens actually had read the regulation from the fact that he had received a copy of the police manual. Maj. op. at 190 n.7.

But even assuming Stephens knew of the regulation, nowhere in the record is there evidence that he was prompted by the regulation to file the three additional charges against Mr. Black, much less that Gable lent his "support and encouragement" to the filing of those charges. *See Porter, supra,* at 321 (opinion of Gibbons, J.). The majority points to no evidence that Stephens' charges were motivated by the regulation. Indeed, the majority relies solely upon the timing of the charges that Stephens filed against Black to supply this critical element. Maj. op. at 190. The thrust of the majority's nexus theory is that because Stephens did not file the three additional charges against Black until some few days after Gable had advised Stephens of Black's complaint and had sought to obtain Stephens' version of the incident, the causal nexus requirement has been satisfied. The majority opinion states that "it was reasonable for the jury to infer that Stephens filed the three additional charges in an effort to delay any disciplinary hearing on the incident." *Id.* (footnote omitted). Not only is the reasonableness of such an inference questionable since, as noted above, Stephens would have had little to gain by filing additional charges, but if Stephens had indeed violated departmental rules, the additional charges would not and could not prevent disciplinary sanctions from ultimately being imposed.[2] Moreover,

2. Disciplinary proceedings against Stephens already had been stayed because of the filing of

the aggravated assault charge against Mr. Black at the time the three additional

the record is completely barren of any evidence which could support a connection between the regulation in question, which did no more than delay departmental hearings, and the charges that Stephens filed against Black.

Furthermore, there is no evidence from which the jury could reasonably have concluded that Gable "supported and encouraged" the filing of additional charges against Black. Gable did no more than advise Stephens of the complaint against him and ask Stephens for his version of the events. Indeed, I suggest that any police chief who did not take these steps to investigate a citizen complaint would be derelict in his duty. This case is quite unlike *Porter, supra,* in which this court upheld an injunction against Police Chief James Porter on the ground that he supported and encouraged misconduct on the part of one of his officers, Frank Baranyai. In *Porter,* the district court had found that

> "despite complaints Porter never found fault with Baranyai pertaining to the charges [of misconduct]. He took no action to discipline him after he was convicted in criminal court of malfeasance in office, he has publicly supported Baranyai in all instances, he could not give a single instance of a report of an investigation to the complainant, and he retaliated against other officers ... who testified or otherwise complained relative to Baranyai's conduct."

*Porter, supra,* at 311 (opinion of Gibbons, J.) (quoting *Commonwealth of Pa. v. Porter,* 480 F.Supp. 686, 701 (W.D.Pa.1979)).

The majority opinion acknowledges that Gable's activities in connection with the Black complaint against Stephens were limited to "[speaking] with Stephens to inform him of Black's complaints and get[ting] his version of the incident." Maj. op. at 190

(citation omitted). It is this evidence, and this evidence alone, that the majority opinion claims supports the jury's finding of "the encouragement and support required to hold Chief Gable liable under section 1983." *Id.* How Gable's informing Stephens about the Black complaint and Gable's inquiry of Stephens about the Black incident can constitute the encouragement and support required by *Rizzo, Lewis,* and *Porter* is never explained by the majority. I suggest an explanation is lacking because there is no evidence in the record that can fill this evidentiary gap.

### C.

The majority also strains to find support in the record for the jury's determinations that Chief Gable had a policy of encouraging members of the Allentown Police Department to engage in the use of excessive force and that that policy proximately caused Stephens to use excessive force against the plaintiffs. Even so, the majority concedes that "the evidence is not overwhelming." Maj. op. at 190. The majority's argument can be summarized as follows: Gable's policy may be found from the procedure used in the filing of complaints made against officers and from his attitude (testimony) concerning the role of force in the proper functioning of a police department. I suggest that there is no evidence in this record from which a jury could have discovered such a "policy" and that even if such a "policy" existed, which the record does not reflect, no causal connection was established between that "policy" and Stephens' actions.

While the majority finds the evidence nonetheless sufficient, it does so only by a selective reading of the record. The majority opinion tries to make it appear that

---

charges—recklessly endangering another person, carrying a concealed deadly weapon, and terroristic threats—were filed. Nothing in the record supports the majority's gratuitous finding that "[t]he filing of additional charges would certainly postpone an adjudication of the initial charge because further fact finding and preparation would be required," and hence would serve to delay disciplinary proceedings

even further. Maj. op. at 190 n.8. Indeed, appellants contend to the contrary, claiming that all charges would be heard together. Even if any postponement did occur, the marginal delay produced by such extra charges could only be slight. This would be especially true if one assumes that the additional charges were unwarranted and hence were more likely to be later dropped or dismissed.

Gable encouraged and expected his officers to use force as a routine part of their job, even when the use of force was not necessary. A more complete examination of the record, however, reveals that, far from taking a cavalier attitude toward the use of force, Gable adopted a restrained and professional approach, tempered by the realization that in today's world, a policeman frequently must use force *where necessary* to overcome resistance to law enforcement.

The majority states that "Chief Gable's policy concerning the use of excessive force ensured that a citizen's complaint about excessive force never went into a police officer's permanent personnel file.... Indeed, such a complaint could only get into an officer's record if the officer put it there himself." *Id.* (citation omitted). A fuller reading of Gable's trial testimony, on which the majority relies, reveals that in fact, Gable had no "policy" on the use of excessive force. Gable testified: "I don't remember when I got [a complaint concerning excessive force], other than this one. So I had no policy, really." Trial Tr. Vol. 4 at 134. This testimony stands uncontradicted.

As disclosed by the record, Gable's handling of complaints concerning use of excessive force was not, as the majority suggests, that of a Chief trying to insulate his officers from public accountability. True, some of these complaints never went into a police officer's personnel file, but this was only the case if the complaints were presented *orally*. When complaints were made in *written* form, whether they were major or minor, they *would* be put in the officer's personnel record. Even with oral complaints, Gable would make a written note of the complaint and retain it in a file in *his* office, and any negative results of a subsequent disciplinary hearing were placed in the officer's personnel records. *Id.* Vol. 4 at 133–35; Vol. 7 at 121–22, 138–39.

The majority quotes Gable as stating that "any officer 'worth his salt' would use force every week of his career because very few arrests are made without it." Maj. op. at 190–91 (footnote and citation omitted). When the trial transcript is read, however,

Gable emerges not as trigger-happy, but as a police chief with a restrained but realistic perspective on the use of force by police officers:

Q. Would I be safe in assuming that you expect your police officers to use force on the job?

A. Yes, I expect that.

Q. And as a matter of fact, would it be safe to say that—would you use the term, a police officer who is worth his salt is going to use force on the job?

A. I think he has to.

Q. Would it also be your view that a police officer who is not using force is not doing his job?

A. I think I can state unequivocally, that if a police officer is on duty day in and day out and makes arrests and attempts to do his job in the climate of today's society, he has to use some kind of force.

Q. Would you estimate for us how often you would expect the average police officer to use force on the job?

A. Would you like to define "force" for me?

Q. We are talking about—

A. People have many versions of what force is and I want your definition, so that I can answer properly.

Q. Physical force.

A. Physical force. How often, you say?

Q. Yes.

A. A week; a year; what?

Q. Maybe this will refresh your recollection?

A. Whenever it is necessary.

Q. How often would you, as Chief, expect your officers to use physical force?

A. I think it depends on the type of calls we get on a given day. *Physical force is only to be used to overcome resistance.* If we get ten people resisting one day, I expect ten people to be overcome by force. *If no one resists that day, I don't want any physical force used, obviously.*

 *   *   *   *   *   *

I would say of course for the record that every policeman uses force almost

every week of his career if he is doing his job, because today, very few arrests are made without it.

\* \* \* \* \* \*

Q. Your feelings on use of force that a good officer uses it once a week, every week of his career; you communicated that to your men?

A. I certainly don't tell the patrolman to say if you don't use force every week you are not doing your job.

Q. They know what your feelings were?

A. They know I was a cop for 32 years and I know what occurs on the street and certainly I don't want them to turn their backs or run away from any problems that might [a]ffect the public.

Trial Tr. Vol. 4 at 135–38 (emphasis added).[3]

The majority also discovered a policy of promoting excessive force from Gable's testimony that, in the majority's words, "Stephens probably would not have been promoted to detective if he had been the type of officer who backed down when force was involved." Maj. op. at 190 (citation omitted). But again, when the actual testimony is examined, it becomes clear that Gable's view was not that an officer should be quick to draw his gun but that timidity is not a desirable trait in a police officer:

Q. Are you saying that if he was one of these other cops that you referred to, the type that backed down; the type who exercised restraint, that wouldn't have mattered?

A. I didn't say that.

MR. STEVENS [counsel for defendants]: I object. There is a difference in backing down and exercising restraint. It is unfair to tie those two together in one question.

3. Other officers testified with regard to Gable's policy respecting the use of force. Chief of Police Allender, who was a Captain at the time of the incident involving Mr. and Mrs. Black, Patrolman McLean, Patrolman Hoffert, and Captain Howells all testified that Gable only advocated the use of force when necessary to overcome resistance. Trial Tr. Vol. 5 at 216–18, 71–73, 75–76, 130–31; Vol. 6 at 14, 21–22.

4. The majority opinion has not characterized the testimony accurately when it states that Gable "never initiated a disciplinary action

MR. ORLOSKI [counsel for plaintiffs]: I will rephrase the question.

. THE COURT: All right.

Q. If Wayne Stephens was the other type of policeman, the type you referred to as the type who backed down—

A. Does not hide when threatened.

Q. If he was the other type, would that—would you still have made him a Detective?

A. Probably not.

Trial Tr. Vol. 4 at 145–46.[4]

Finally, the majority cites two other incidents prior to the one involving the Blacks where citizens complained about Stephens, as evidence of Gable's policy of encouraging the use of excessive force and of that policy's relationship to Stephens' acts toward the plaintiffs. Maj. op. at 191 n.9. Although the opinion does not make the relevance of these incidents clear, they could only have been cited for the theory that their occurrence is an indication of Gable's encouragement of excessive force and that Gable's failure to discipline Stephens for those two incidents led Stephens to believe that use of such force would be accepted in the future.

Even if one accepts the view that the evidence permits a conclusion that excessive force was used in the two incidents,[5] they are insufficient to establish liability. First, the fact that a few isolated incidents involving excessive use of force occurred or that no disciplinary action was taken in response to them is insufficient to show the existence of a policy encouraging the use of such force. *See Turpin v. Mailet*, 619 F.2d 196, 202–03 (2d Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980).

against an officer based solely on his evaluation of the officer's use of force." Maj. op. at 190 (citation omitted). Gable's testimony merely indicated that there had to be a complaint filed before any disciplinary action would begin. Trial Tr. Vol. 4 at 146.

5. The jury, in response to Interrogatory No. 9, found that Stephens, prior to March 21, 1977, did *not* have a propensity to use excessive force in the performance of his police duties.

Second, Gable's failure to discipline Stephens cannot, under *Rizzo* and *Lewis*, satisfy the requirement of a causal link between official action and the police misconduct. As a majority of this court, sitting *en banc*, stated in *Porter, supra* :

> [T]he officials' misconduct cannot be merely a failure to act. Such officials must have played an affirmative role in the deprivation of the plaintiffs' rights, *i. e.*, there must be a causal link between the actions of the responsible officials named and the challenged misconduct.
>
> \* \* \* \* \* \*
>
> Here, ... the gravamen of the charge against the Council members is that complaints were made, but no action was taken. However, *Lewis* also held that no evidence of the essential causal link existed where there was no more than "an unfortunate insensitivity on the part of responsible officials toward reports of abuses .... "

659 F.2d at 336–37 (opinion of Garth, J.) (citations omitted).

Moreover, I believe the record evidence falls so far short of showing that Gable had a *de facto* policy of encouraging the use of excessive force, or that Stephens acted pursuant to such a "policy" in his treatment of the plaintiffs on the night in question, that no jury question was presented. *Dawson, supra,* 630 F.2d at 959. The plaintiffs have failed to prove the "existence of an unconstitutional policy or plan adopted and enforced by the official defendants." *Lewis, supra,* 554 F.2d at 98. As in *Rizzo, supra,* and *Lewis,* there is a "complete absence of any causal link between the individual police officer['s] conduct and the responsible authorities." *Lewis, supra,* 554 F.2d at 98.

## II. THE CITY OF ALLENTOWN

The sole basis upon which the City of Allentown was held liable was that the regulation concerning postponement of disciplinary proceedings, which I have discussed earlier in section I–B of this opinion, constituted a governmental policy that proximately caused Detective Stephens to file unwarranted charges against Black.

Maj. op. at 191. Since the evidence failed to establish a causal link between the regulation and Stephens' actions so as to hold Gable liable, the same absence of proximate causation necessarily exists with respect to the City, whose asserted liability is founded solely on Gable's role as a municipal policymaker.

*Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the decision upon which the City's asserted liability is based, makes clear that it is only "when *execution of a government's policy* or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, *inflicts the injury* that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. at 2037 (emphasis added). *Monell* made it clear that a municipality cannot be held liable under section 1983 on a theory of *respondeat superior. Id.* Thus, absent a showing of a causal link between official policy as reflected in the police regulation and Stephens' actions, *Monell* prohibits a finding of liability against the City.

## III. DAMAGES

The majority summarily dismisses defendants' challenge to the jury's award of damages by stating that no "abuse of discretion" occurred; that the jury was carefully instructed on the issue of damages; and that the punitive damage instructions were not erroneous. Maj. op. at 192. It does so despite the fact that the damage award, *on its face,* clearly suggests that the jury disregarded both the law and the facts when it decided the amount and apportionment of damages.

Detective Stephens, who certainly was the most culpable of the defendants, was found liable for $500 in compensatory damages and for no punitive damages.

Chief Gable, whose conduct consisted of no more than promulgating an innocuous regulation and allegedly setting a policy that "caused" Stephens to violate the plaintiffs' rights, and who thus was at best one-

step removed from any wrongdoing, was found liable for $3,000 in compensatory damages and $1,500 in punitive damages.

Finally, the City of Allentown, which was found liable solely because one of its officials, Gable, promulgated an "improper" regulation, and thus was twice removed from any wrongdoing, was found liable for $20,000 in compensatory damages and $10,000 in punitive damages.

It is clear to me that the jury, when it came to the awards against Gable and the City, decided that instead of assessing damages based on the actual harm to the Blacks, it would arbitrarily award damages based on the City's deep pocket. Although our scope of review of the *amount* of damage awards is extremely narrow, *Murray v. Fairbanks Morse*, 610 F.2d 149, 152 (3d Cir. 1979), we nevertheless must reverse an award of damages when it is clear from the record that no evidence existed on which damages could be predicated, or that the jury did not follow the trial judge's instructions as to the legal standard to be applied. We also must reverse an award when the jury has assessed damages that the Supreme Court has held to be impermissible.

### A.

Despite the lack of an evidentiary basis, the district court permitted the jury in assessing compensatory damages against Gable and the City to include the attorneys' fees Black incurred in defending himself against the unwarranted charges filed against him. To establish attorneys' fees as an element of compensatory damages, the plaintiff must prove not merely the amount billed by the attorney, but also that the amount charged was reasonable and necessary for the services rendered. *See Prentice v. North Am. Title Guar. Corp.*, 59 Cal.2d 618, 620, 30 Cal.Rptr. 821, 381 P.2d 645, 647 (1963); *Cleland v. McLaurin*, 40 Idaho 371, 376, 232 P. 571, 573 (1925); *Verhagen v. Platt*, 1 N.J. 85, 92, 61 A.2d 892, 895 (1948); *Hiss v. Friedberg*, 201 Va. 572, 577, 112 S.E.2d 871, 876 (1960); *Roberts v.*

*Ball, Hunt, Hart, Brown & Baerwitz*, 57 Cal.App.3d 104, 112, 128 Cal.Rptr. 901, 907 (1976); McCormick on Damages § 70 (1935). As one court stated in the context of medical expenses, " 'if [plaintiff] failed to prove by further testimony the reasonableness of these payments, it constituted a . . . failure of proof, which rendered immaterial the proof as to what she had paid.' " *Ross v. Foss*, 77 S.D. 358, 366, 92 N.W.2d 147, 152 (1958) (citation omitted). *Accord, Foodtown Stores, Inc. v. Patterson*, 282 Ala. 477, 483–84, 213 So.2d 211, 216–18 (1968). When a jury, rather than a judge, is to make the determination of the reasonableness and necessity of the charges, expert testimony is required as to the value of the services rendered. *See* 3 Wigmore on Evidence § 715 (Chadbourn rev. 1970); *cf. Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp. (Lindy I)*, 487 F.2d 161, 169 (3d Cir. 1973) (when judge hears the case, expert testimony on value of lawyer's services not necessary); *Tranberg v. Tranberg*, 456 F.2d 173, 175 (3d Cir. 1972) (same). Evidence of the reasonableness and necessity of professional charges cannot rest on mere hearsay. *See* 3 Wigmore, *supra*, § 719 ("[t]he statements of persons declaring their estimates of the prices they would give or receive are not taken, on the credit of those persons, as trustworthy assertions of the fact of value").

At trial, the only testimony concerning attorneys' fees was given by Mr. Black, who testified that he had incurred expenses of $9,420, calculated at a rate of $60 per hour. Trial Tr. Vol. 11 at 19–21. On cross-examination, Mr. Black admitted that he did not know how many hours his attorney spent on his trial, what items the bill covered, which lawyers (partners, associates, clerks, etc.) in his attorney's firm spent the time for which he was charged, or whether any charges for the instant suit were included in the $9,420 fee. He conceded that he did not know whether the bill was fair and reasonable for the work that was done.[6]

Much of what this court said in *Lindy Bros., supra*, albeit in a somewhat different

---

**6.** Mr. Black's testimony was as follows:

Q. You are not a lawyer, sir?

A. No, sir, I am not.

context,[7] is relevant here. For instance, in discussing just one aspect of fees, our court said:

> Before the value of the attorney's services can be determined, the district court must ascertain just what were those services. To this end the first inquiry of the court should be into the hours spent by the attorneys—how many hours were spent in what manner by which attorneys. It is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney. But without some fairly definite information as to the hours devoted to various general activities, e. g., pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, e. g., senior partners, junior partners, associates, the court cannot know the nature of the services for which compensation is sought.

487 F.2d at 167.[8]

In addition to ascertaining the number of hours spent and the nature of the services

rendered, a determination of the reasonable value of legal work requires a finding of a reasonable hourly rate for each attorney involved, based on his legal reputation, experience, and type of work done. *Id.* Even after this is done, however, "[t]he court cannot properly fix attorneys' fees merely by multiplying the hourly rate for each attorney times the number of hours he worked on the case"; the quality of the lawyers' work and the complexity and novelty of the issues in the case must also be considered. *Id.* at 167–68.

Evidence is required so that a jury may determine the reasonableness and necessity of attorneys' fees when they are sought as compensatory or reimbursable damages, as they are here. But here the jury was denied this evidence. The district court expressly rejected defendants' argument that the plaintiff had to prove that the legal charges were fair and reasonable. Trial Tr. Vol. 11 at 69. It was thus error to permit the jury to include attorneys' fees as damages. We can safely assume in light of the

Q. *You don't know of your own knowledge whether that bill is fair and reasonable for what was done?*
A. *I do not know. All I know is that I believe it to be fair because my attorney I think is a fair man.*
Q. You have no way yourself of knowing that, sir?
A. I have no way of knowing it, no.
Q. I take it this $9,000 figure is gotten by multiplying $60 times a certain number of hours?
A. It is, I believe.
Q. *How many hours did he spend on the trial; do you know, sir?*
A. *No.*
Q. *Do you know what all of the items are that were called for in that bill?*
A. *Not all of them.*

    *    *    *    *    *    *

Q. *So, you don't know whether or not the hours that were spent were necessary for your case?*
A. *I could not say, no.*
Q. You can't tell us that?
A. No.
Q. Your lawyer is Mr. Calnan?
A. Yes.
Q. Is he the man who handled everything?
A. Yes, he and his firm.
Q. And that would be Mr. Orloski?

A. I don't know Mr. Orloski assisted. At that time Mr. Calnan was my attorney and if he assisted, I don't know to what degree.
Q. So you don't know whose efforts went into making up the total of that $9,000?
A. No, I couldn't say. I was obligated to Mr. Calnan. Who he delegated any part of the work to, I am not aware of.
Q. Sir, of your own knowledge, you don't know whether any of the items for this lawsuit might be included in that $9,000, do you?
A. I do not know.
Trial Tr. Vol. 11 at 50–52 (emphasis added).

7. Although *Lindy Bros.* dealt with the standards that should guide the awarding of fees to attorneys who successfully conclude class action lawsuits, and did not address the issue of fees as an element of compensatory damages, the court's central inquiry—ascertaining the value of the attorneys' services—was the same there as it is here.

8. At trial, the district court admitted into evidence, over defense counsel's hearsay objection, a set of itemized bills from Mr. Black's attorney. Trial Tr. Vol. 11 at 67–69. The itemized bills were hearsay and should have been excluded, and thus cannot provide a basis for any conclusion as to the reasonableness or necessity of the charges.

amount of the jury's verdict that this error alone amounted to an improper assessment against the City of $9,420.[9]

B.

From the jury's verdict, it is clear that the jury disregarded the trial court's instruction that damages be assessed against each defendant based on that defendant's constitutional violations,[10] and instead apportioned damages based on its estimate of each defendant's financial resources. It is inconceivable that any damages attributable to Gable by his having indirectly caused Stephens to act as he did, could be greater than the $500 damages inflicted by Stephens himself. It is even more inconceivable that the City, whose liability can only be based on Gable's actions, could have injured the plaintiffs more than Gable did.

In their brief, the Blacks attempt to explain the jury's strange verdict by artificially apportioning among the three defendants the various wrongs done to them. *See* Appellees' Brief at 25–27. Stephens, it is said, was held least liable because he was only found responsible for the initial use of excessive force when the Blacks' car was first stopped at 10th and Lehigh Streets. Gable was more culpable because he not only was responsible for encouraging Stephens' use of force, but also for the "car chase after the gun incident [that] accentuat[ed] and prolong[ed] the trauma initially inflicted . . . by Officer Stephens." *Id.* at 26. Finally, the City had the greatest liability because it caused the arrest and the filing of unwarranted charges against Mr. Black, which led to embarrassment, humiliation, mental anxiety, and the $9,420 in attorneys' fees.

The jury's interrogatories, however, clearly show that responsibility for the various events cannot be so parceled out among the defendants so as to offer a *post hoc* rationalization of the apportionment of damages. The jury expressly found that *both* Stephens *and* Gable were liable for the excessive force used against the plaintiffs at 10th and Lehigh Streets.[11] *All three*

9. An additional problem exists concerning damages and the award of attorneys' fees. If, as the majority asserts, Maj. op. at 190, the causal link between the police regulation and Stephens' conduct (and hence the liability of Gable and the City) depends on the fact that Stephens filed additional charges after learning of Black's complaint, it is manifest that only damages attributable to the *additional* charges, and not to the *initial* charge, could be assessed against Gable and the City. In particular, attorneys' fees associated with the initial charge could not properly be part of any award against those two defendants.

Of the three additional charges filed by Stephens, two—carrying a concealed deadly weapon and terroristic threats—were dropped. The third additional charge, recklessly endangering another person, apparently went to trial at the same time as the initial charge of aggravated assault. After trial, Black was found guilty of simple assault but not guilty of the recklessly endangering charge. Trial Tr. Vol. 11 at 49–50. Thus, all of the additional charges were disposed of favorably to Black by the end of that trial. Therefore, after that date no other fee charges, even if properly proved, could be assessed against Gable or the City. Yet, the attorneys' bill placed before the jury included $4,500 in charges which occurred after Black's trial had terminated. These charges were apparently for the appeal of Black's conviction on the *initial* assault charge, Exh. A–D–1, and

thus could not be included in the damages assessed here under any theory presented by the plaintiff.

10. In its charge to the jury, the court indicated that "a particular defendant can be held liable in damages only for damages arising out of those constitutional deprivations which you found in respect to a particular defendant." Trial Tr. Vol. 11 at 109.

11. The interrogatories read as follows:

Q. [No. 6.] Do you find that Defendant Wayne Stephens used excessive force against Plaintiff Joyce Black at 10th and Lehigh Streets on March 21, 1977?
A. Yes.
Q. [No. 7.] Do you find that Defendant Wayne Stephens used excessive force against Plaintiff Elwood Black at 10th and Lehigh Streets on March 21, 1977?
A. Yes.
Q. [No. 16.] Do you find that Defendant Carson Gable had a policy of encouraging members of the Allentown Police Department to engage in the use of excessive force in the performance of their duties as police officers?
A. Yes.
Q. [No. 17.] Do you find that Defendant Carson Gable's policy of encouraging members of the Allentown Police Department to

defendants were found responsible for the unwarranted charges filed against Mr. Black.[12] No finding of liability was made as to the "car chase" following the gun incident. Thus, if anything, the City, having been found responsible for only one constitutional violation rather than two (as with the other defendants), should have been assessed the *least* in damages, rather than the most. In addition, it is apparent that the damages assessed against Gable should have been no more than (if not less than) those assessed against the primary actor in this case, Stephens.[13]

In making these observations, I do not intend to invade the jury's discretion with regard to the amount of damages. Here, the jury, by its findings concerning liability, had already ranked the defendants as to their respective culpability. It is no usurpation of the role of the jury to demand that when it imposes damages, the jury remain faithful to its liability determinations.

### C.

In *Cochetti v. Desmond*, 572 F.2d 102, 106 (3d Cir. 1978), this court stated that "the punitive damage remedy must be reserved . . . for cases in which the defendant's conduct amounts to something more than a bare violation justifying compensatory

damages." An award of punitive damages is permissible only when "the defendant acted with actual knowledge that he was violating a federally protected right or with reckless disregard of whether he was doing so." *Id.*

There is no evidence in this record to support the jury's conclusion that Gable, in his promulgation of the administrative regulation or in his attitude toward the use of force, knowingly or recklessly violated citizens' constitutional rights. As I demonstrated in Part I–B of this opinion, the testimony at trial showed that the purpose of the regulation was not to provide a means by which a police officer could avoid inquiry into his performance, but was merely to prevent disciplinary proceedings from interfering with ongoing criminal cases. It was designed to do so by postponing the former until the latter were complete. Gable testified that it had never come to his attention that any police officers were filing false charges because of the regulation. Trial Tr. Vol. 7 at 132. If there is any link between the regulation and the violation of constitutional rights (which there is not), that link is so attenuated that it could not justify a punitive award. As this court stated in *Fisher v. Volz*, 496 F.2d 333, 349 (3d Cir. 1974):

---

engage in the use of excessive force in the performance of their duties as police officers proximately caused Defendant Wayne Stephens to use excessive force against Plaintiff Joyce Black or Plaintiff Elwood Black at 10th and Lehigh Streets on March 21, 1977?
A. Yes.
App. at 10–12.

**12.** The interrogatories read as follows:
Q. [No. 14.] Do you find that Defendant Carson Gable promulgated and implemented an administrative regulation which proximately caused Defendant Wayne Stephens to arrest and file unwarranted charges against Plaintiff Elwood Black?
A. Yes.
Q. [No. 15.] Do you find that Defendant City of Allentown promulgated and implemented an administrative regulation which proximately caused Defendant Wayne Stephens to arrest and file unwarranted charges against Plaintiff Elwood Black?
A. Yes.
App. at 11.

**13.** In addition to being improperly apportioned among the defendants, the damages were also improperly distributed as between the Blacks. The compensatory and punitive damages assessed against the City were assessed in favor of *both* Mr. *and* Mrs. Black, despite the fact that the City was found liable for injury to Mr. Black only. *See* Interrogatory No. 15, *quoted in* note 12 *supra*. Damages against the City in favor of Mrs. Black were assessed even though she was never arrested or charged. At trial, the district court rejected the notion that the City had injured Mrs. Black and sustained an objection to testimony by Mrs. Black concerning harm allegedly caused her by the charges filed against her husband. Trial Tr. Vol. 11 at 58–60. The court noted: "This does not appear to be a deprivation found by the jury under the interrogatories. Also, it is speculative. It is simply too far afield. Furthermore, it is not articulated in the final pretrial order." *Id.* at 60. Despite this ruling, the court nevertheless entered judgment for $30,000 against the City in favor of *both* Mr. *and* Mrs. Black.

A superior police officer may not be subjected to punitive damages because of wrongful acts by a subordinate officer if there is no evidence that the superior officer ordered or personally participated in the acts, or knew or should have known that the acts were taking place and acquiesced in them.

Similarly, as I have demonstrated, the record cannot fairly be read to indicate any policy on the part of Gable promoting the use of excessive force. As shown in Part I–C above, Gable expected his officers to use force only when necessary to overcome resistance. Nowhere in the record is there any evidence that Gable sanctioned, much less knowingly or recklessly encouraged, the use of excessive force. If a police chief cannot tell his officers to use force *when it is necessary* to effectuate proper law enforcement without exposing himself to punitive civil liability, then we have indeed departed from everyday reality.

If Gable cannot be found liable for punitive damages, then neither can the City, whose liability is solely based on Gable's conduct. In any event, however, the award of punitive damages against the City must be stricken in light of the Supreme Court's recent holding in *City of Newport v. Fact Concerts, Inc., supra,* that punitive damages are not available against a municipality in actions under 42 U.S.C. § 1983. I cannot agree with the majority's decision to ignore the clear mandate of the Court. *See* Maj. op. at 184 n.1.

Despite the unequivocal instruction of the Supreme Court, the majority relies on the fact that the defendant City did not object to the district court's punitive damage charge on the ground of municipal immunity and thereby waived that defense. The

majority concedes that an identical procedural default did not bar the Supreme Court from deciding the punitive damages question in *Newport.* The majority, however, attempts to distinguish *Newport* by arguing that

> [i]n sharp distinction to this case, where the issue was neither raised nor briefed in the lower court nor prior to argument in this court, in *Newport* the question of whether a municipality may be held liable for punitive damages "was squarely presented and decided on a complete trial record by the court of first resort, was argued by both sides to the Court of Appeals, and has been fully briefed before this Court."

*Id.* (quoting *Newport, supra,* —— U.S. at ——, 101 S.Ct. at 2754). Having highlighted this difference between the two cases, the majority proceeds to hold for this reason alone that the City here should be denied the immunity that *Newport* mandates.

I believe the majority has turned a blind eye to the essence of the *Newport* decision and instead elevated a collateral consideration in the Court's opinion to a matter of controlling significance.[14] What *is* controlling in *Newport* is the Court's central holding that municipalities are immune from punitive damage liability in section 1983 cases like this one. This is a purely legal issue; the blanket municipal immunity recognized by the Court does not depend on the facts, the credibility of witnesses, or other matters usually within the special competence of the trial court. Thus, while the views of the district court on the issue of immunity might be very helpful in other situations, in the context of this case their significance is greatly reduced in importance.[15] Indeed, had the district court in

---

**14.** Indeed had the applicability of Rule 51 been the central issue in *Newport,* I doubt very much that the Court would have granted certiorari. As the Court noted in its opinion:

> We undertake review here in order to resolve ... the availability of punitive damages, and it would scarcely be appropriate or just to confine our review to determining whether any error that might exist is sufficiently egregious to qualify under Rule 51. The very

novelty of the legal issue at stake counsels unconstricted review.

—— U.S. at ——, 101 S.Ct. at 2754.

**15.** Where this court has been in as good a position to decide a question of law or a mixed question of law and fact as was the trial court, we have never hesitated to do so without remanding or deferring to that court. *See, e. g., Government of the Virgin Islands v. Rasool,* 657 F.2d 582, 585 (3d Cir. 1981); *United*

this case considered the question of municipal liability and decided it adversely to the City, I suggest that this court would have had no reluctance in summarily reversing that determination on the authority of *Newport.* It is thus irrational to affirm the punitive damages award against the City on the ground that the district court did not have an opportunity to consider a question on which its views would, in light of *Newport,* have been irrelevant. This point is underscored by the fact that when the punitive damages issue was specially briefed before this court, the parties did not even argue the substantive immunity question.

It is true that Rule 51 of the Federal Rules of Civil Procedure provides that "[n]o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." But that Rule no more requires us to find waiver here than it required the Supreme Court to find it in *Newport.* In *Newport,* the Supreme Court recognized that the purpose of Rule 51 is to encourage counsel to correct errors in the judge's charge before the trial ends, while these errors can still be rectified. The Rule seeks to avoid situations in which an error in jury instructions would necessitate a new trial, one that could have been prevented had the error been brought to the judge's attention before jury deliberations began.

I do not see how the policies behind Rule 51 would be furthered by finding a waiver by the City in this case. Here, the jury, pursuant to the judge's instructions, rendered separate verdicts against the City as to compensatory and punitive damages. A holding that punitive damages against the City are barred would simply result in striking the $10,000 punitive damage award against the City without any necessity for further proceedings. *See Newport, supra,* —— U.S. at —— n.12, 101 S.Ct. at 2754 n.12. The correction of the erroneous

charge at this point involves no greater cost than would have been incurred had the point been raised at trial.

Contrary to the majority's suggestion, Rule 51 "is not inexorable." *Hoffman v. Sterling Drug, Inc.,* 485 F.2d 132, 139 (3d Cir. 1973). Indeed, the Supreme Court in *Newport* emphasized that review of unchallenged jury instructions is not restricted to instances of "plain error." —— U.S. at ——, 101 S.Ct. at 2754. Our court as recently as this month in an *en banc* decision characterized the Supreme Court's discussion in *Newport* as "reaffirm[ing] the inherent power of the court to consider certain legal issues as required by the interests of justice despite the failure of the parties to preserve them in a timely fashion." *Weaver v. Bowers,* 657 F.2d 1356, 1361 (3d Cir. 1981) (en banc). Indeed, the court *en banc* went on to state: "We believe that in unusual circumstances the courts of appeals also have inherent power to reach issues although not timely raised below. We have previously done so when the occasion warranted." *Id.* (citations omitted). Thus, the majority's position in refusing to acknowledge the explicit instruction and holding of *Newport* is not only in conflict with the Supreme Court but is also contrary to the most recent expression of our court *en banc.*

The Supreme Court's ruling in *Newport,* that Congress did not intend taxpayers to bear the burden of paying punitive damages in cases under section 1983, established a fundamental principle of section 1983 jurisprudence. It would be unjust to the City to ignore that principle here. As our court recently stated in *United States v. 564.54 Acres of Land,* 576 F.2d 983, 987 (3d Cir. 1978), *rev'd on other grounds,* 441 U.S. 506, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979), "Although generally jury instructions will not be reviewed on appeal if they were not objected to at trial, we have the discretion to review instructions *sua sponte* if the

*States v. Belle,* 593 F.2d 487, 497 (3d Cir.) (en banc), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 277 (1979). Indeed, where the evidence is wholly documentary, we decide even

purely factual questions and do so as a matter of course. *See, e. g., Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 n.3 (3d Cir. 1978).

error is fundamental and highly prejudicial ... and our failure to consider the error would result in a miscarriage of justice" (footnotes omitted). This court has frequently applied and reaffirmed this principle. *See id.* at 987 n.3 (citing cases); *Morley v. Branca*, 456 F.2d 1252, 1253 (3d Cir. 1972) (per curiam); *Ratay v. Lincoln Nat'l Life Ins. Co.*, 378 F.2d 209, 212 (3d Cir.), *cert. denied*, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967); *Wilson v. American Chain & Cable Co.*, 364 F.2d 558, 562 (3d Cir. 1966).

The general rule is that an appellate court must apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice. *Bradley v. School Bd.*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); *Thorpe v. Housing Auth.*, 393 U.S. 268, 281–82, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 (1969). I would follow the clear dictates of the Supreme Court and strike the punitive damages assessed against the City.

### IV.

Because the majority's opinion is flawed in these fundamental respects, I cannot join it. Quite apart from my concerns about the unsupportable liability and unjustified damages imposed on Chief Gable and the City, I fear that by endorsing the district court's rulings on this record, we are promulgating precedents that conflict with principles established by this court and by the Supreme Court.

Accordingly, I would direct the district court to enter judgment in favor of Police Chief Gable and the City of Allentown notwithstanding the jury's verdict. At the very least, I would remand for a new trial as to those two defendants on both liability and damages. I would do so because the evidentiary rulings which I have discussed pervade both phases of the plaintiffs' case against Gable and the City, and both aspects are so intertwined that, in my opinion, a new trial on both liability and damages is required if judgment notwithstanding the verdict is not ordered.

Therefore, except as to the verdict against Detective Stephens, a jury determination which, on this record, binds us on appeal, I respectfully dissent.

### SUR PETITION FOR REHEARING

The petition for rehearing filed by appellants in the above entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.

### STATEMENT BY JUDGE ADAMS SUR DENIAL PETITION FOR REHEARING

Judge Adams votes for rehearing primarily because he is concerned that the award of punitive damages against the City of Allentown may be barred by *City of Newport v. Fact Concerts, Inc.*, —— U.S. ——, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), and also because the evidence does not appear to support an award of damages in the relative proportions reported by the jury.

### STATEMENT BY JUDGE GARTH SUR DENIAL PETITION FOR REHEARING

Judge Garth would grant the petition for rehearing for the reasons expressed in his panel dissent.

Judge Weis would grant the petition for rehearing in banc.