**Sarah E. FAGAN, et al., Plaintiffs,**

v.

**The CITY OF VINELAND,
et al., Defendants.**

**Civ. A. No. 90–310 (WGB).**

United States District Court,
D. New Jersey.

July 30, 1992.

Eisenstat, Gabage & Berman by Gerald M. Eisenstat, Vineland, N.J., for Sarah Fagan.

Dilworth, Paxson, Kalish & Kauffman by Penny Conley, Philadelphia, Pa., for Mary Ellen Duke.

Gruccio, Pepper, Giovinazzi & DeSanto by Thomas Farnoly, Vineland, N.J., for Jeffrey Pindale.

Parker, McCay & Cruscuolo by David Parker, Marlton, N.J., for East Landis Hotel/Amnon Corp.

Horn, Kaplan, Goldberg, Gorny & Daniels by A. Michael Barker, Atlantic City, N.J., for City of Vineland, et al.

Jacob, Robinson & Ferrigno by Arnold Robinson, Millville, N.J., for Wanda Pindale.

Sachs & Sachs by Peter Sachs, Holmdel, N.J., for Mary Ellen Duke.

Shapiro & Shapiro by Harold B. Shapiro, Vineland, N.J., for plaintiff Maurice Davis.

Horovitz, Perlow, Morris & Pirolli by Barry A. Perlow, Bridgeton, N.J., for defendant VTL, Inc., t/a Town Liquors.

Basile, Testa & Testa by Frank G. Basile, Vineland, N.J., Co-counsel for Albino Genetti, Adm'r Ad Prosequendum of Estate of Albert Stavoli.

Clifford Van Syoc, Cherry Hill, N.J., for Officer Phillip Bocelli.

## OPINION

BASSLER, District Judge:

Defendants the City of Vineland, the Vineland Police Department, Chief of Police Joseph P. Cassisi, Police Captain Mario R. Brunetta, Officer David Tesoroni, Officer Beny Velez, Officer Richard Putnam, Officer Phillip Bocelli, and Officer Peter Coccaro III (the "Vineland defendants") have filed five motions seeking summary judgment.

The first motion asks for summary judgment in favor of all the Vineland defendants on the plaintiffs' claims under 42 U.S.C. § 1983 alleging a Fourteenth Amendment violation, arguing that the claim may only proceed as a Fourth Amendment violation. For the following reasons, this motion will be denied.

The second motion seeks summary judgment in favor of all the Vineland defendants on (1) the plaintiffs' claims under 42 U.S.C. § 1983 of violation of their Fourteenth Amendment right to due process, and (2) plaintiffs' negligence claims under the New Jersey Tort Claims Act. For the following reasons, summary judgment will be granted in favor of the defendants on the claims under 42 U.S.C. § 1983, and the

New Jersey Tort Claims Act claims will be dismissed for lack of jurisdiction.

The third, fourth and fifth motions were filed individually by officers Richard Putnam, Peter Coccaro III, and Phillip Bocelli. For the reasons stated in the discussion of the second motion described above, these defendants are granted summary judgment on the claims under 42 U.S.C. § 1983, and the claims under the New Jersey Tort Claims act are dismissed.

## I. INTRODUCTION

These are five consolidated lawsuits arising out of an automobile accident that followed the police pursuit of a car in Vineland, N.J.

Plaintiffs are those who survived the accident, and the relatives and estates of those who did not. They allege that the their substantive due process rights as guaranteed by the Fourteenth Amendment were violated because the police involved in the chase recklessly disregarded police pursuit guidelines, and because the remaining Vineland defendants failed to train and supervise these officers. Plaintiffs also claim that the Vineland defendants are liable under the New Jersey Tort Claims Act.[1]

The Vineland defendants have filed five motions for summary judgment.

In the first, they argue that plaintiffs may not assert a Fourteenth Amendment substantive due process violation stemming from a police pursuit. Rather, they argue, the claim must be brought, under the Supreme Court's holding in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), as a violation of the Fourth Amendment's prohibition of unreasonable searches and seizures. The second motion argues that, assuming the claim was appropriately brought as a Fourteenth Amendment claim, summary judgment is required because plaintiffs have failed to show that the Vineland defendants acted arbitrarily during the pursuit. Further, this motion argues, the Vineland defendants are entitled to good-faith immunity to certain state-law claims.

---

1. In addition, these plaintiffs name other defendants not involved in these motions, alleging

any claims brought under the New Jersey Tort Claims Act.

In three separate motions, defendant officers Putnam, Bocelli and Coccaro move for summary judgment on the state-law and Section 1983 claims, arguing that their actions. were not arbitrary.

For the purposes of this motion, the following background as described by the plaintiffs will be accepted as true.[2]

## A. The Pursuit

Shortly before 2 a.m. on March 6, 1988, defendant Officer David Tesoroni ("Tesoroni") was on routine patrol on Landis Avenue in Vineland. Landis Avenue is the main street running through the city's business district, and is a popular gathering place and cruising spot for young people. As Tesoroni was heading west on Landis Avenue, he spotted a white Camaro heading east. As the car passed, Tesoroni saw a passenger in the Camaro stand up through the car's open T-top.

The Camaro was driven by Jeffrey Pindale ("Pindale"), 19. In the front passenger seat was his wife, Wanda, and riding in back were his friends, Al Stavoli and Maurice Davis.

In order to give the driver a warning for an offense described by Tesoroni as "riding on parts not intended for," Tesoroni made a U-turn on Landis Avenue and accelerated. In the meantime, Pindale turned right off Landis Avenue on to Eighth Street heading south. Tesoroni followed the Camaro on to Eighth Street, and as he made the turn, activated his overhead lights. He could not tell whether Pindale was speeding. The Camaro continued south on Eighth Street for two blocks, and then turned right onto Grape Street heading west, where it accelerated to between 35 and 40 miles per hour.

The Camaro then proceeded through two stop signs, where it slowed but failed to stop, and Tesoroni continued to follow.

The Camaro turned left on to Sixth Street heading south, and then left again on to Montrose Street heading east. Tesoroni was following at 30 to 35 miles per hour and the Camaro was pulling away at 35 to 40 miles per hour, in a residential area with a 25–mile–per–hour speed limit. At this point Tesoroni advised headquarters of his actions.

The pursuit continued in this fashion in the same kind of residential neighborhood, and more stop signs were run. When Pindale reached Almond Street and East Avenue, he turned off his headlights. The pursuit continued, the Camaro traveling at about 40 miles per hour.

Back at headquarters, defendant Sgt. Edgar Zatzariny ("Zatzariny") was in charge, and had the authority to order Tesoroni to discontinue the pursuit, but never did so. Zatzariny asked the dispatcher to ask Tesoroni why he was pursuing the Camaro, but Tesoroni never responded.

When it turned on to Chestnut Avenue— a four-lane road, two lanes in each direction—the Camaro accelerated to 50 miles per hour, traveling west, still without headlights. Tesoroni continued his pursuit.

During the chase on Chestnut Avenue, defendant Officer Richard Putnam ("Putnam") pulled out on to Chestnut Avenue from a sidestreet, facing his car eastward and blocking Chestnut Avenue's outside westbound lane. Putnam's headlights and overhead lights were on, but the Camaro sped past, Tesoroni still in pursuit. Putnam waived his arms in an unsuccessful effort to signal the Camaro to stop. There is some dispute, according to the plaintiffs, over whether he got out of his patrol car to waive his arms.

At some point during the pursuit on Chestnut Avenue, defendant Officer Peter Coccaro ("Coccaro") used his patrol car to block off Eighth Avenue, where it intersects with Chestnut Avenue, in order to

**2.** Neither the plaintiffs nor the defendants offered a substantial overall statement of facts in their briefs. This factual background, therefore, is taken from the plaintiffs' statement of disputed and undisputed facts provided pursuant to Gen.Rule 12(G), which is substantially similar to the version of the facts they offered in their brief submitted in opposition to an earlier summary judgment motion by the Vineland defendants. For the purposes of this motion, the factual version offered by the plaintiffs will be accepted as true.

prevent cars from entering Chestnut Avenue from Eighth Avenue. The Pindale car then sped past on Chestnut Avenue heading west at a high rate of speed, and Coccaro pulled out on to Chestnut Avenue heading east, although there is some suggestion by plaintiffs that Coccaro may actually have pursued the Camaro. Coccaro says he never participated in the pursuit.[3]

Around this time, defendant Officer Beny Velez ("Velez") approached Chestnut Avenue at Sixth Street. He saw the Camaro pass by with Tesoroni one to two blocks behind. Velez turned onto Chestnut Avenue in front of Tesoroni but behind the Camaro, and became the lead vehicle in the pursuit, his overhead lights and siren on. Velez estimated that the Camaro was travelling at 70 to 80 miles per hour, and that he was travelling at 50 to 60 miles per hour. As Velez came over a rise at about Fourth Street and Chestnut Avenue he saw the Camaro some blocks ahead near the intersection with Holly Hill Terrace.

Velez then radioed to headquarters that the Camaro was approaching the intersection of Chestnut Avenue and Delsea Avenue. At that intersection, the Camaro ran a red light and collided with a pickup truck traveling on Delsea Avenue. Killed were the occupants of the pickup truck, Christopher Duke and Michael Fagan, and one of the passengers in the Camaro, Al Stavoli. Wanda Pindale and Maurice Davis were severely injured, and Jeffrey Pindale, the driver, was less seriously injured.

A witness to the collision, Anthony Campbell, saw four police cars approach the accident scene from westbound Chestnut Avenue.

### B. The Guidelines

At the time of the accident, the City of Vineland had adopted the police pursuit guidelines promulgated in 1986 by the New Jersey Attorney General and County Prosecutors Association ("the guidelines"). They read, in part:

### A. When to pursue

Generally, police officers shall make every responsible effort to apprehend a fleeing vehicle. Therefore, a pursuit may be initiated whenever a law violator refuses to stop and uses his vehicle to flee. The pursuit should always be tempered with common sense and the officer should be aware of the degree of hazard to which he exposes himself and others. The decision to conduct such a pursuit should depend upon the seriousness of the threat that the violator presents to other persons or to society in general; hence the objective of the pursuit must be to apprehend a violator, and the purpose of the apprehension must be to bring the perpetrator to trial.

Guidelines at 3–4.

The guidelines suggest that these factors be taken into account by an officer considering whether to pursue a suspect:

1. The nature of the violation.
2. The likelihood of successful apprehension.
3. The hazard created by the high speed pursuit.
4. The volume, type, speed and direction of the traffic.
5. The nature of the area, whether residential, commercial, school zone, open highway, etc.
6. The population density.
7. Familiarity with the roads.
8. The weather and road conditions; i.e., the width and curves of the roadway; stopping and sight distances.

Furthermore, plaintiffs consent to summary judgment in favor of defendant Officer Bocelli. Therefore, this opinion does not specifically address Bocelli's involvement, which consisted merely of observing the chase and attempting to turn his patrol car around, and while doing so, witnessing the accident.

---

**3.** As noted, this version of the facts is taken from the plaintiffs' brief in opposition to an earlier motion for summary judgment by the Vineland defendants, and from plaintiffs' Gen. Rule 12(G) statement. The plaintiffs do not address Coccaro's actions in either place, however. This version of Coccaro's involvement is, therefore, taken from a version contained in the plaintiffs' brief opposing Coccaro's individual motion for summary judgment.

9. The officer's driving skills and condition of the police vehicle.

Guidelines at 4.

Further, the guidelines offer three possible scenarios and suggest certain action:

1. *Non-hazardous violations* such as motor vehicle equipment defects, inspection overdues, and registration violations, never warrant prolonged pursuit or the operation of a motor vehicle at excessive speeds. The risk exceeds the necessity for immediate apprehension.

2. *Completed violations.* Where the danger has passed, *i.e.*, failure to obey a stop sign, a traffic signal, improper passing, or any other non-continual violation, a prolonged pursuit of a motor vehicle at excessive speeds is seldom warranted, particularly when it may cause a greater risk than the violator intended. The responsible discretion of the police officer is relied on very heavily to justify his decision to pursue or not to pursue.

3. *Indictable violations and continuing hazardous violations.* Pursuit is often necessary to make an apprehension of one suspected of the commission of an indictable offense. In such instances serious potential for bodily harm or property loss may occur in the event that apprehension does not occur immediately. For example, in kidnapping, destruction or abandonment of critical contraband or evidence, commercial theft, burglaries or the flight of a first or second degree offender, the need to apprehend is paramount but must be weighed against the dangers involved to other highway users, pedestrians, the officer in pursuit and the suspect.

Guidelines at 4–5.

Plaintiffs' expert Leonard Territo, Ph.D., ("Territo") has testified that the pursuit violated these guidelines, and that the officers involved acted recklessly under the circumstances. His testimony, which the plaintiffs contend precludes summary judgment, is addressed below.

**4.** Shortly after oral argument was heard on these and other motions, this case was trans-

## II. DISCUSSION

### A. *Procedural History*

The two motions brought by all of the Vineland defendants are the second and third summary judgment motions brought by all of the Vineland defendants seeking dismissal of the claims alleging violation of due process. The first motion, which led to the resolution of the issues raised again in these two motions, was decided by U.S. District Court Judge Joseph Rodriguez in July 1991. Afterward, this case was transferred here.[4] Proper consideration of these motions requires an understanding of the first summary judgment motion and Judge Rodriguez's decision.

The first motion for summary judgment by the Vineland defendants sought dismissal of the civil rights claims against them, and argued that the undisputed facts gave rise to neither a Fourteenth Amendment claim nor a Fourth Amendment claim. In support, defendants submitted a 41–page brief, which was met with a 49–page opposition brief submitted by plaintiffs. Defendants then filed a five-page, single-spaced reply brief.

On July 29, 1991, Judge Rodriguez filed two orders, one granting the motion in part, and the other denying the motion in part. Judge Rodriguez granted defendants' motion for summary judgment on the Fourth Amendment search-and-seizure claim, finding that no seizure occurred, and that a Fourth Amendment violation, therefore, could not have occurred. In support, Judge Rodriguez cited *Pleasant v. Zamieski*, 895 F.2d 272, 276 (6th Cir.1990).

In the second order, Judge Rodriguez denied defendants' motion for summary judgment on plaintiffs' Fourteenth Amendment claim, citing *Landol–Rivera v. Cruz Cosme*, 906 F.2d 791 (1st Cir.1990).

Thus, after the disposition of the Vineland defendants' first motion, the only remaining right alleged to have been violated under 42 U.S.C. § 1983 was the substantive

ferred to a third judge.

due process right contained in the Fourteenth Amendment.

These motions were filed in January 1992.

### B. Effect of Judge Rodriguez's Orders

Judge Rodriguez's two orders of July 29, 1991 decided those issues defendants seek to reopen here. Plaintiffs, therefore, argue that the motions must be denied under local court rules and the law of the case doctrine. Therefore, this court will, as a threshold matter, discuss the effect of Judge Rodriguez's order on each motion before addressing the motion's merits.

#### (1) The First Motion

■ This motion argues that *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1988) requires that the facts may give rise only to a claim that the plaintiffs' rights under the Fourth Amendment's prohibition of unreasonable searches and seizures were violated, and not to a claim of violation of plaintiffs' rights under the Fourteenth Amendment's guarantee of due process.[5]

That claim, however, was raised in defendants' original motion, and rejected by Judge Rodriguez's order of July 29, 1991:

> The *Connor* court only stated that "we make explicit what was implicit in *Garner*'s analysis, and hold that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the [fourth amendment's reasonableness standard]." *Id.* at 395 [109 S.Ct. at 1871] (emphasis in original). There was no seizure in this matter, therefore, there is no "explicit textual source of constitutional protections against this sort [of governmental conduct]." *Id.* at 395 [109 S.Ct. at 1871]. "Since a specific constitutional amendment does not govern plaintiffs' claim[s,] [plaintiffs] may properly claim under the

Fourteenth Amendment." *Frye* [*v. Town of Akron*] 759 F.Supp. 1320, 1324 (N.D.Ind.1991). *Accord Landol–Rivera v. Cruz Cosme*, 906 F.2d 791 (1st Cir. 1990) ("We assume that claims of excessive force outside the context of a seizure still may be analyzed under substantive due process principles.").

July 29, 1991 order of Judge Rodriguez, p. 4, n. 4.

Six months after Judge Rodriguez filed this order, defendants filed this motion raising the same issue. What they are asking, then, is for this court to undo Judge Rodriguez's decision. In order to grant defendants' motion, this court would have to find that only a Fourth Amendment violation may be alleged—in direct contravention of Judge Rodriguez's finding that no seizure has taken place.

Defendants argue that the issue was not given proper attention on their first motion. I disagree. Extensive briefs were submitted addressing, in part, this precise issue. Furthermore, Judge Rodriguez specifically addressed this issue, and did so in depth. That he addressed the issue in a footnote indicates not that he gave the issue little attention, but that he considered the issue significant enough to set it apart from the main body of what was a relatively short opinion.

Gen.Rule 12(I) requires that a party seeking reconsideration file a notice of motion for reargument within ten days of a decision it feels was wrong. At that time, the party may submit a brief "setting forth concisely the matters or controlling decisions which counsel believes the Court has overlooked." Gen.Rule 12(I). This motion, which essentially seeks reconsideration of a matter previously decided, was filed six months after Judge Rodriguez's decision, and at a time when trial was imminent.

Therefore, the Vineland defendants have failed to take advantage of the procedure by which they might have challenged the

---

**5.** The Supreme Court in *Connor* held that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the

fourth amendment and its 'reasonableness' standard rather than under a 'substantive due process' approach." *Connor*, 490 U.S. at 395, 109 S.Ct. at 1871.

decision. They now hope, apparently, that the second judge assigned to this case will disagree with the decision of the first judge.

The Third Circuit "follows a restrictive view of the circumstances in which the work of one judge may be undone by another. Under the law of the case doctrine, once an issue has been decided, it will not be relitigated in the same case except in unusual circumstances." *Geibel v. United States,* 667 F.Supp. 215 (W.D.Pa.1987), *aff'd,* 845 F.2d 1011 (3d Cir.1988).

This doctrine, of course, has exceptions. As the Supreme Court has said, the "[l]aw of the case directs a court's discretion, it does not limit the tribunal's power." *Arizona v. California,* 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). Thus, the doctrine is not a "barrier to correction of judicial error." *Loumar, Inc. v. Smith,* 698 F.2d 759, 762 (5th Cir.1983).

▮▮▮ The Third Circuit recognizes exceptions to the law of the case doctrine when: a timely motion is made for reconsideration by a second judge when the first judge is unavailable; evidence not considered by the first judge becomes available for consideration by the second judge; a supervening rule of law renders invalid the decision rendered by the first judge; and when the first judge's decision was "clearly erroneous and would work a manifest injustice." *Schultz v. Onan Corp.,* 737 F.2d 339, 345 (3d Cir.1984).

The only possible exception to application of the doctrine here is the fourth exception, requiring a finding that Judge Rodriguez's decision was clearly erroneous and would work a manifest injustice if allowed to stand. However, the defendants have not shown that Judge Rodriguez's decision was clearly erroneous.[6] Nor will it work a manifest injustice. To the contrary, granting a last-minute motion for summary judgment seeking reconsideration of an issue decided

six months earlier—and based on a three-year-old Supreme Court case cited by the defendants and the plaintiffs in arguing the issue the first time around—would itself be manifestly unjust.

Therefore, because Judge Rodriguez decided this issue nearly a year ago; because the Vineland defendants failed to take advantage of their opportunity to challenge what they now argue to have been an erroneous decision; because no new evidence nor supervening rule of law exists; and because defendants had the opportunity to brief this issue in their first motion, and in fact did so extensively in their reply brief after raising it in their brief in support of the motion, the Vineland defendants' motion for summary judgment based on *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1988), is denied.

The court now turns to the effect of Judge Rodriguez's order on the Vineland defendants' second motion for summary judgment, which assumes that these claims properly allege Fourteenth Amendment violations rather than Fourth Amendment violations.

### (2) The Second Motion

▮▮▮ In this motion, the Vineland defendants argue that (1) the plaintiffs' expert fails to conclude that the police officers acted arbitrarily, thus negating their due process claim, and (2) the plaintiffs' expert fails to conclude that the officers acted in bad faith, thereby negating plaintiffs' claims under the New Jersey Tort Claims Act.

Judge Rodriguez did not specifically address these issues in his order. Instead, he found generally that genuine issues of material fact existed, and that the moving parties were not entitled to judgment as a matter of law on a number of issues, including the plaintiffs' due process claims and plaintiffs' claims under the New Jersey

---

6. In fact, after extensive review of the issue, this court reaches the same conclusion Judge Rodriguez reached in his order of July 29, 1991. No seizure occurred in this case, and thus the claim is more appropriately brought under the Fourteenth Amendment. *See, e.g., Frye v. Town of*

*Akron,* 759 F.Supp. 1320 (N.D.Ind.1991); *Roach v. City of Fredericktown,* 882 F.2d 294 (8th Cir. 1989); *Jones v. Sherrill,* 827 F.2d 1102, 1103–1104 (6th Cir.1987) (citing *Galas v. McKee,* 801 F.2d 200, 202–203 (6th Cir.1986)).

Tort Claims Act. *See* July 29, 1991 order of Judge Rodriguez denying in part defendants' initial motion for summary judgment.[7]

Furthermore, the deposition of plaintiffs' expert Territo, which provides the basis for this motion, was not taken until January 21, 1992. The Vineland defendants argue that Territo failed to conclude that the officers acted arbitrarily, and that, without proof of arbitrary behavior, the Fourteenth Amendment claim must fail. The motion assumes, therefore, that arbitrary action is required to sustain a due process claim. The plaintiffs disagree, arguing instead that the officers' actions need only be reckless and callously indifferent to the rights of the plaintiff.

Plaintiffs also argue that Territo failed to conclude that the officers acted in bad faith, entitling the officers to good-faith immunity under the New Jersey Tort Claims Act.

Because Territo's deposition provides new evidence not before Judge Rodriguez on the initial motion, and because Judge Rodriguez did not specifically address these issues, the law of the case doctrine does not bar consideration of this issue. *Schultz, supra,* 737 F.2d at 345. I will, therefore, address the merits of this motion.

### C. Merits of the Second Motion

#### (1) The Summary Judgment Standard

The stringent mandates of the Federal Rules of Civil Procedure permit summary judgment only if all the probative materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See, e.g., Hersh v. Allen Products Co.,* 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.,* 721 F.2d 118, 119 (3d Cir. 1983).

In determining whether there exist any genuine issues of material fact, the court must resolve all reasonable doubt in favor of the nonmoving party. *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismd.,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972). Further, courts should keep in mind that "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

However, under the standards announced by the Supreme Court's trilogy in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. 242, 106 S.Ct. 2505; *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2510 (emphasis in original). A disputed fact is "material" only if it would affect the outcome of the suit. *Id.,* 477 U.S. at 248, 106 S.Ct. at 2510.

Further, where the moving party has made a properly supported motion for summary judgment, it is incumbent upon the nonmoving party to come forward with specific facts to show that there is a genuine issue of material fact for trial. *Id.,* 477 U.S. at 248, 106 S.Ct. at 2510. Thus, once the moving party has carried its burden of establishing the absence of genuine issues of material fact, the nonmoving party "may not rest upon mere allegations or denials" of its pleading, Fed.R.Civ.P. 56(e), but must produce sufficient evidence to reasonably support a jury verdict in its favor. *Id.,* 477 U.S. at 249, 106 S.Ct. at 2511; *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d

---

**7.** As to the New Jersey Tort Claims Act, Judge Rodriguez held that "[n]o blanket common law immunity applies for the pendent state claims," citing *Smith v. Nieves,* 197 N.J.Super. 609, 485 A.2d 1066 (App.Div.1984); and that "[d]efendant police officers must prove good faith for statutory immunity to apply," citing *Marley v. Palmyra Borough,* 193 N.J.Super. 271, 473 A.2d 554 (Law Div.1983).

610, 618 (3d Cir.1987) (Becker, J., concurring). A mere showing of "some metaphysical doubt as to material facts" will not suffice. *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356.

■ In essence, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511. Consequently, the court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrate, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict. *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829, 860 (3d Cir.1990).

Thus, summary judgment motions require judges to "assess how one-sided evidence is, or what a 'fair-minded' jury could 'reasonably' decide." *Anderson*, 477 U.S. at 265, 106 S.Ct. at 2519. Often, this is a task more easily described than executed. As the Third Circuit recently discussed in a case involving—as does this complaint—a substantive due process claim brought pursuant to 42 U.S.C. § 1983:

> Whether the quantum of circumstantial evidence in any particular case is enough to meet the [*Anderson*] standard sometimes requires us to make difficult, fact-specific, perhaps somewhat arbitrary judgments.

*Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 461 (3d Cir.1989).

With these principles and cautions in mind, the court now turns to the defendants' motion for summary judgment on the plaintiffs' claim that their due process rights were violated, and on plaintiffs' state-law negligence claims.

### (2) The Substantive Due Process Claim

■ In order to state a claim under 42 U.S.C. § 1983 ("Section 1983"), a plaintiff must show (1) a violation of a right secured by the Constitution or laws of the United States (2) committed by a person acting under color of state law. 42 U.S.C. § 1983; *West v. Atkins*, 487 U.S. 42, 48–49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988).

It is undisputed that the officers were acting under color of state law. What is in dispute is whether the first of the two Section 1983 requirements—violation of, in this case, a constitutional right—has been fulfilled. Plaintiffs argue that their Fourteenth Amendment right to substantive due process was violated. Defendants disagree, and seek summary judgment.

What kind of state action constitutes a substantive due process violation? Certainly not simple negligence. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1985).[8] Beyond that, however, a review of the cases shows that the standard to be applied to substantive due process claims has been only vaguely defined. As one court observed, "the Supreme Court has not yet enunciated a standard by which to determine precisely which state lapses constitute substantive due process violations." *Silverman v. Barry*, 845 F.2d 1072, 1079 (D.C.Cir.1988).[9] The issue is a difficult one not squarely addressed by

---

**8.** For instance, the Fifth Circuit has affirmed dismissal of a Section 1983 complaint that arose when a police car, responding to a report of a robbery, struck and killed a pedestrian. The court said that the complaint alleged

> only that the actions of the officers and the city *with respect to the Walton accident* were negligent and in willful and wanton disregard for the safety of others; there is no reference whatsoever to the general pattern of police activity in Hattiesburg. Plaintiff therefore has failed to plead the claim that she asserts is sufficient under § 1983 and instead has pleaded one which she concedes cannot be the

basis of federal jurisdiction: an isolated act of negligence.

*Walton v. Salter*, 547 F.2d 824, 825 (1976) (emphasis in original).

As the Supreme Court has said, "[s]ection 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Baker v. McCollan*, 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979).

**9.** The court in *Silverman* went on to conclude that, at least, "grave unfairness" in the discharge of official responsibility must be shown. *Silverman*, 845 F.2d at 1079.

the parties.[10]

While it has not, in an opinion, addressed a police pursuit case, the Supreme Court frequently has observed that the due process clause bars arbitrary governmental actions. *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989). By barring certain government actions "regardless of the fairness of the procedures used to implement them, it serves to prevent governmental power from being 'used for purposes of oppression.'" *Daniels,* 474 U.S. at 331, 106 S.Ct. at 665 (citing *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2975–76, 41 L.Ed.2d 935 (1974)).

The Supreme Court also has said that "substantive due process prevents the government from engaging in conduct that 'shocks the conscience.'" *United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987); *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). A review of case law indicates that, in cases involving police pursuits, most courts have applied something akin to the shocks-the-conscience test.

A Fourth Circuit case provides the most recent guidance. In *Temkin v. Frederick County Com'rs,* 945 F.2d 716 (4th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992), the police pursuit began when an officer noticed a car spinning its wheels as it left a gas station. The officer gave chase with lights and siren activated, both cars traveling at speeds ranging from 65 to 105 miles per hour along a narrow, two-lane highway with cars parked along both sides. During the chase, the officer was notified that $17 had been stolen from the gas station. At some point, the pursued vehicle failed to navigate a turn and struck the vehicle driven by plaintiff, an uninvolved third party. The plaintiff's car was then struck by the pursuing officer's car, and the plaintiff suffered severe, permanent injuries.

The plaintiff in *Temkin* filed a Section 1983 complaint, claiming violation of her substantive due process right. The trial court granted summary judgment, applying the "shocks the conscience" standard, and the Fourth Circuit affirmed, holding that the proper standard had been applied and that, under that standard, no constitutional violation had been committed. The Supreme Court declined to review that decision.

Part of the rationale in *Temkin* for choosing the shocks-the-conscience standard was the court's concern that Supreme Court precedent required, for a due process violation, conduct beyond that which would give rise to an available state-law tort claim. While the New Jersey Supreme Court has yet to address the issue, a recent Appellate Division of Superior Court decision concludes that New Jersey law provides substantial immunity from liability to police involved in chases resulting in injuries. *Tice v. Cramer,* 254 N.J.Super. 641, 604 A.2d 183 (App.Div.1992). The New Jersey Supreme Court granted certification in the *Tice* case on May 28, 1992. Unless the state Supreme Court overturns *Tice,* then, no state tort action is available to these defendants. *Temkin* left unsettled the question whether the unavailability of a negligence action should effect the standard to be applied to a substantive due process claim. *Temkin,* 945 F.2d at 720–721, n. 4.

The unavailability of a remedy under New Jersey law, however, should not preclude a determination that the shocks-the-conscience standard should apply to the substantive due process claim. As Judge Garth of the Third Circuit said in a concurring opinion,

> No authority has been called to my attention that supports the conclusion that a state's immunity statute must ineluctably lead to a denial of due process such that section 1983 must be expanded to encompass negligence actions. The absence of a particular state remedy can-

---

10. None of the parties made an effort to determine with precision the kind of state action required to make out a due process violation in cases involving police chases, making these motions substantially more difficult than they needed to have been.

**602**

not, without more, require that a federal remedy be provided.

*Davidson v. O'Lone,* 752 F.2d 817, 832 (3d Cir.1984) (Judge Garth concurring).

Further, in a footnote, Judge Garth foresees almost precisely that predicament now faced. His comment bears repeating, and its reasoning is adopted here:

> Were an absolute grant of immunity, precluding state tort suits, sufficient to establish a right to a federal remedy, a pedestrian negligently struck by a police car racing to apprehend a criminal, would be entitled to maintain a 1983 action in federal court if a state immunity statute shielded police from liability for negligent acts occurring in the course of duty. Yet, if the enactment of an immunity statute by a state is deemed to result in a federal remedy by default, not only would the state's legitimate interest in fashioning rules of tort law be curtailed, but also state law would then determine the content of 1983 action in federal court. This reasoning "would make the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). I suggest that to allow a federal constitutional remedy in the circumstances presented here is not only contrary to the purposes of section 1983 but necessarily trivializes 1983 actions.

*Id.,* 752 F.2d at 832, n. 4.

Given Judge Garth's comment, and the Fourth Circuit's statement that conduct which shocks the conscience "violates the substantive guarantees of the Due Process Clause independent of the absence or presence of post-deprivation remedies available through state tort law," *Temkin,* 945 F.2d at 720, this court does not regard the officers' immunity to a state-law tort claim in New Jersey to require, by way of compensation, application of some lesser standard in the substantive due process claim.

Further, the Fourth Circuit is not the only court to require action that shocks the conscience in order to sustain a due process claim arising out of a police chase. In one case, the Fifth Circuit reversed summary judgment in favor of the police defendants because the record was sufficient to sustain a jury finding that the pursuing officers had acted with malice—an indication that the officers abused their discretion in such a way as to "shock the conscience." *Checki v. Webb,* 785 F.2d 534, 538 (5th Cir.1986). Nothing in the record here indicates these officers acted maliciously.

Finally, the Eleventh Circuit has made clear that injuries caused by the negligent, or even grossly negligent, operation by a police officer of a patrol car do not give rise to a Section 1983 cause of action. *Cannon v. Taylor,* 782 F.2d 947, 950 (11th Cir.1986). The court in *Cannon* cites to *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), which states:

> Presumably, under this rationale any party who is involved in nothing more than an automobile accident with a state official could allege a constitutional violation under § 1983. Such reasoning 'would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States.' *Paul v. Davis,* 424 U.S. 693, 701 [96 S.Ct. 1155, 1160, 47 L.Ed.2d 405] (1976). We do not think that the drafters of the Fourteenth Amendment intended the Amendment to play such a role in our society.

*Id.,* 451 U.S. at 544, 101 S.Ct. at 1917.

And the Second Circuit has noted that, in cases involving a victim not under the state's control, "a constitutional violation is not generally found [citations omitted], unless the government conduct is 'sufficiently severe, sufficiently disproportionate to the need presented and so deliberate and unjustified a misuse of [authority] as to transcend the bounds of ordinary tort law and establish a deprivation of constitutional rights.'" *McClary v. O'Hare,* 786 F.2d 83, 88 (2nd Cir.1986) (quoting *Shillingford v. Holmes,* 634 F.2d 263, 266 (5th Cir.1981)).

Application of the shocks-the-conscience standard to police pursuits, then, finds support in Supreme Court cases and cases from other circuits. In this circuit, further-

more, the shocks-the-conscience standard has been used in cases involving allegations that police used excessive force. *Black v. Stephens,* 662 F.2d 181 (3d Cir. 1981). The court in *Black* first observed that not all common law torts committed by police officers rise to the level of a Section 1983 claim. *Id.,* 662 F.2d at 188. The court then held that "[t]he test under the due process clause is whether the police officer's conduct 'shocks the conscience.'" *Id.* (citing *Rhodes v. Robinson,* 612 F.2d 766, 772 (3d Cir.1979) (quoting *Rochin,* supra, 342 U.S. at 172, 72 S.Ct. at 209)).

The court in *Black* determined that a police officer's actions may shock the conscience when, without identifying himself as an officer and without provocation, the officer brandishes a revolver 18 inches from a man's head with the man's wife directly in the line of fire. *Id.,* 662 F.2d at 189.

Further, the Third Circuit has said that, "[w]hen the only finding is that of mere negligence, as here, we cannot find the "outrageousness" or abuse of official power that warrants raising the tortious conduct of the prison official to the level of a deprivation of constitutional right within the scope of § 1983." *Davidson,* 752 F.2d at 829.

In *Davidson,* the court again applied the shocks-the-conscience test described by the Supreme Court in *Rochin, supra.* It further noted that, in *Rochin,* the Supreme Court said that "[d]ue process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice.'" *Davidson,* 752 F.2d at 829 (quoting *Rochin,* 342 U.S. at 173, 72 S.Ct. at 210).

█ Behavior that shocks the conscience, then, is outrageous behavior, or behavior that offends a sense of justice.[11] It is this standard that must be used to evaluate the motion.

█ While certain of these officers may have shown poor judgment, even that conclusion is more easily reached long after the fact, rather than in the heat of the moment. Certainly, however, poor judgment itself does not amount to a due process violation. Something more is required, and police chase cases in other circuits and analogous Third Circuit law suggests that what is required is action that shocks the conscience, or action that is so outrageous as to offend a "sense of justice." Nothing here does that, and the Vineland defendants are, therefore, entitled to summary judgment on the due process claim.[12]

█ The Vineland defendants, in support of their motion, note that plaintiffs' expert Territo failed to describe the officers' actions as arbitrary. In that way, the defendants point out what they believe to be an absence of proof of a substantive due process violation. At summary judgment, the moving party need not affirmatively disprove the non-moving party's case, but only point out the absence of

**11.** A more specific standard has not been articulated. Neither, however, is it necessary to do so here.

For instance, the Third Circuit has held that "[c]ustodial officials may be liable in damages for the suicide of a pretrial detainee if they acted with 'deliberate indifference' to the individual's psychological need." *Williams v. Borough of West Chester, Pa.,* 891 F.2d 458, 464 (3d Cir.1989). In a footnote, however, the court wrote:

In *Colburn v. Upper Darby Township,* 838 F.2d 663 (3rd Cir.1988), we concluded that police officers are obligated under the Fourteenth Amendment not to act with "reckless indifference." *See* 838 F.2d at 669. However, we have not attempted to draw distinctions among terms like "reckless indifference," "de-

liberate indifference," "gross negligence," or "reckless disregard" in this context. *See id.* at 670. We decline to do so in this opinion and will, therefore, use the term "deliberate indifference" to refer to the type of conduct or state of mind described by these terms collectively.

*Williams,* 891 F.2d at 464 n. 10.

**12.** A variety of courts have reached similar conclusions in cases involving police chases. *See, e.g., Jones v. Sherrill,* 827 F.2d 1102, 1106 (6th Cir.1987) (requiring "outrageous conduct"); *Roach v. City of Fredericktown,* 882 F.2d 294 (8th Cir.1989); *Apodaca v. Rio Arriba County,* 905 F.2d 1445 (10th Cir.1990) (where the officer, responding to an alarm, was not using his siren or flashing lights); *Britt v. Little Rock Police Dept.,* 721 F.Supp. 189 (E.D.Ark.1989).

proof of an essential part of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Faced with a properly supported motion, the plaintiffs are obligated to come forth with more than their mere allegations in order to substantiate their claim. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

Faced with that burden, plaintiffs cite only the testimony of their expert, Territo, to support their argument that the officers acted recklessly. Nothing in Territo's testimony, however, is sufficiently probative of a level of recklessness that would shock the conscience. Because plaintiffs rely so heavily on this testimony, certain of the portions they offer will be quoted verbatim.

Asked if the decision to give chase was arbitrary, Territo testified

A. No. I think it was a premeditated decision. I think they thought through what they wanted to do and did it.

Q. That is to say you recognize that they thought through the situation, they considered the factors such as we have just discussed, but they came to the wrong decision, in your opinion?

A. Probably so.

Q. One of the factors they must have considered, you must concede, was that it was their obligation to attempt to enforce the law—

A. Yes.

Q. —for the purpose of preserving the public safety and welfare?

A. That's correct.

Q. Putting that altogether in the wash and mixing it all up, it's your opinion they did that, but they came out with the wrong answer?

A. Yes.

Territo Deposition, transcript at 120.

And, as to the 1986 guidelines promulgated by the Attorney General, Territo testified as follows:

Q. What is it that Officer Tesoroni did that leads you to the conclusion and the opinion that he had not, as you say, internalized the guidelines or the principles of these guidelines?

A. He engaged in a prolonged and dangerous pursuit; a danger to him, the fleeing motorist, the occupants of that car, and uninvolved third parties, in spite of having this policy.

Q. So—

A. The behaviors—the behaviors indicate that, to me.

Q. Behavior does. And your opinion is that had he internalized these guidelines, his behavior would have been not to go any further than three blocks behind the Jeffrey Pindale vehicle?

A. That's not what I'm saying. He might have gone four or five or six blocks, but, surely, surely, by the time he reached the point where this guy turns his lights off, he's got to know he's got an unlighted guided missile that he's chasing. He's got to know at that point this is dangerous, it's time for me to terminate pursuit at that point.

*Id.* at 124.

Territo also testified:

Q. As a matter of fact, the attorney general guidelines indicate, and I think you might have referred to it in your report, that the responsible discretion of the police officer is relied on very heavily to justify the decision to pursue or not pursue, isn't that correct?

A. That's a part of it, yes, sir.

Q. And that's part of the guidelines that these officers were operating under?

A. That's a part of it, yes, sir.

Q. Are you telling the jury in this case that these officers did not exercise their discretion?

A. What I'm saying is they exercised their discretion very poorly and that the first thing they should have considered was the nature of the violation, which is the number one thing on the policy. The nature of the violation is a major factor in determining whether you're going to pursue and how long you're going to pursue. That's what I'm saying. It was

a part of the policy. It's not the totality. Discretion is not a blank check.

*Id.* at 110.

The defendant officer who initiated the pursuit, Tesoroni, said he did so after observing a passenger in the car hanging out the T-top; after the car ran at least two stop signs; and after the car's lights were turned off:

Q. Why did you react to the Camaro shutting off its lights?

A. To me it was a willful and wanton disregard for the value of human life as well as property at this point and that he was a substantial risk to the community by turning off his lights and traveling at these speeds in an attempt to elude me as a police officer in the performance of my duties.

Deposition of Officer Tesoroni, transcript at p. 106.

The tenor of Territo's testimony is that the officers thought through their actions, but came to the wrong conclusion under the police pursuit guidelines. That may be so, but a wrong decision simply can not be construed as outrageous, shocking behavior, or behavior that would offend a sense of justice. No fair-minded jury would so conclude, and as the Supreme Court has said, summary judgment motions require courts to "assess how one-sided evidence is, or what a 'fair-minded' jury could 'reasonably' decide." *Anderson,* 477 U.S. at 265, 106 S.Ct. at 2519. Territo's testimony does not give rise to a fair-minded jury's ability to find the shocking, outrageous conduct necessary to sustain a due process allegation.

Other than Territo's testimony, plaintiffs offer nothing other than a general statement that material factual issues exist. This court's review of the plaintiffs' own representation of the facts through their briefs and through their Gen.Rule 12(G) statement, however, reveals absolutely nothing of a material nature to be in dispute. Which cars were involved in the chase, or exactly how fast they were going or what they did, are not *material* issues given that even the plaintiffs' version of these facts fails to indicate outrageous behavior that would shock the conscience or offend a sense of justice.

The material facts are uncontroverted. Pindale's passenger was hanging out of the car. Pindale was speeding. Pindale ran several stop signs. Pindale eventually turned off his headlights. Therefore, Officer Tesoroni determined that the car posed a danger to the public, and pursued it. Coccaro blocked off traffic on a sidestreet, and may have joined the pursuit. Officer Putnam may have blocked off one lane of the road and waived his arms to get Pindale to stop. Officer Velez joined the pursuit for a brief period. And Pindale continued on, lights off, speeding, running red lights.

Nothing about any of this police conduct—neither the decision to pursue, nor the manner of pursuit—shocks the conscience. That an officer would continue pursuit under these circumstances does not shock the conscience. That another officer would join the pursuit does not shock the conscience. That yet another officer would partially block the road and signal the car to stop does not shock the conscience. And that still another officer would block traffic from entering the path of the pursuit certainly does not shock the conscience.

As the Supreme Court has said, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2510 (emphasis in original). A disputed fact is "material" only if it would affect the outcome of the suit. *Id.,* 477 U.S. at 248, 106 S.Ct. at 2510. Plaintiffs point to no dispute, and this court could discover nothing in the record, which, if resolved in plaintiffs' favor, would lead a jury to conclude that these officers acted in a manner that shocks the conscience.

It would certainly be reasonable to describe the three deaths and horrible injuries involved here as "shocking." The nature of injury involved is unquestionably terrible, causing untold pain and heartache. It is not, however, the nature of the injuries, but their cause, with which the court must concern itself. And these injuries were not

caused by the constitutionally impermissible acts of the defendant police officers, for no such acts occurred.

■ Finally, the cases make clear that, absent some underlying constitutional violation, the City of Vineland and the supervising officers named as defendants can not be found liable for a failure to train or supervise. As the Eighth Circuit has said:

> [I]n order for municipal liability to attach in a situation such as this, there must first be an underlying violation of the plaintiff's constitutional rights by a municipal employee (for whose action the City is presumably, to be held accountable).

*Roach v. City of Fredericktown*, 882 F.2d 294, 298 (8th Cir.1989) (citing *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Absent a constitutional violation arising from the chase, then, no liability can attach for failure to train or supervise. *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986). Thus, summary judgment is also appropriate in favor of the City of Vineland and the superior officers charged with failure to train and supervise.

The court now turns to the state-law negligence claims.

#### (3) The New Jersey Tort Claims Act

■ As noted, a recent New Jersey decision appears to require summary judgment on the claims brought under the New Jersey Tort Claims Act. *Tice v. Cramer*, 254 N.J.Super. 641, 604 A.2d 183 (App.Div. 1992).

The court in *Tice* held that (1) police officers engaging in high-speed chases may be immunized from suit if acting in good faith under N.J.S.A. 59:3–3 (cited here by defendants); and (2) that N.J.S.A. 59:5–2(b) provides a more broad-based immunity from suit for any injury resulting from a police chase (a section not specifically asserted by defendants as ground for immunity).

The New Jersey Supreme Court granted certification in the *Tice* case on May 28, 1992.

Because summary judgment has been granted on the Section 1983 claims, however, this court lacks jurisdiction to decide the state-law claims. As the Third Circuit has said, "once all federal claims have been dropped from a case, the case simply does not belong in federal court." *Lovell Mfg. v. Export–Import Bank of the U.S.*, 843 F.2d 725, 734 (3d Cir.1988). "Absent 'extraordinary circumstances,' a district court in this circuit is powerless to hear claims lacking an independent jurisdictional basis, and 'time already invested in litigating the state cause of action is an insufficient reason to sustain the exercise of pendent jurisdiction.'" *Id.*, 843 F.2d at 735 (quoting *Weaver v. Marine Bank*, 683 F.2d 744, 746 (3d Cir.1982)).

One of the extraordinary circumstances permitting the retention of jurisdiction over a state-law claim is the expiration of the state statute of limitations. *Cooley v. Pa. Housing Fin. Agency*, 830 F.2d 469, 476 (3d Cir.1987). In this case, the applicable statute of limitations is two years. N.J.S.A. 2A:14–2. However, New Jersey courts have tolled the statute of limitations during the pendency of a claim in federal court. *See Galligan v. Westfield Centre Service, Inc.*, 82 N.J. 188, 412 A.2d 122 (1980).

Finally, the state issue involved here has broad implications, was recently taken under consideration by the New Jersey Supreme Court, and has captured significant public attention. *See* Tom Toolen, *State Reviewing Police Car Pursuits*, N.Y. Times, July 26, 1992, at Section 13, p. 1; Richard Pliskin, *Court to Consider Chase Immunity for Police*, The New Jersey Law Journal, July 20, 1992, at p. 5. "[W]here the underlying issue of state law is a question of first impression with important implications ... factors weighing in favor of state court adjudication certainly predominate." *Shaffer v. Board of School Directors of the Albert Gallatin Area School District*, 730 F.2d 910, 913 (3d Cir. 1984).

Therefore, this court declines to decide the summary judgment motion on the state-law claim for lack of jurisdiction. Accordingly, the state-law claims against the Vineland defendants are dismissed. This conclusion does not affect those claims not addressed by these motions.

### III. CONCLUSION

While the plaintiffs' Section 1983 claim properly alleges a violation of the Fourteenth Amendment, rather than the Fourth Amendment, summary judgment is appropriate in favor of the police officers involved in the chase, those in the Vineland Police department charged with supervising and training these officers, and the City of Vineland itself.

Summary judgment having been granted on the lone federal claim, there remains no basis on which to retain jurisdiction over the state-law claims against these defendants, and they are therefore dismissed for lack of jurisdiction.

An appropriate order follows.